HISPANIC COALITION ON REAPPOR-
TIONMENT; Alfred Delgado, Nitza
Santiago, Nayda Cintron, and Julio Ol-
medo, individually and on behalf of all
others similarly situated

v.

LEGISLATIVE    REAPPORTIONMENT
COMMISSION; Democratic Party City
Committee of Philadelphia; David Glan-
cey and Robert O'Donnell in their offi-
cial capacities, William R. Davis, Secre-
tary of the Commonwealth of Pennsyl-
vania, his successor, if any, agents, as-
signees, and employees.

Civ. A. No. 82–0480.

United States District Court,
E. D. Pennsylvania.

April 6, 1982.

Angel L. Ortiz, Philadelphia, Pa., Puerto Rican Legal Defense & Ed. Fund, Cesar Perales, Gabe Kaimowitz, Juan Cartagena, New York City, for plaintiffs.

Thomas N. O'Neill, Jr., Larry R. Barron, Philadelphia, Pa., for Legislative Reapportionment Commission.

Antoinette Stone, Philadelphia, Pa., for Democratic Party City Committee of Philadelphia, David Glancey and Robert O'Donnell.

John G. Knorr, III, Harrisburg, Pa., for William R. Davis, Secretary of the Com. of Pa.

Before GARTH, Circuit Judge, and LUONGO and BECHTLE, District Judges.

## MEMORANDUM OPINION

BECHTLE, District Judge.

The regrettable but inevitable disappointment that follows reapportionment has surfaced again in the case before us. Challenged are the district boundaries of a single seat in the Pennsylvania House of Representatives. Plaintiffs contend that those boundaries were designed with the purpose and effect of diluting or diffusing the Hispanic vote in a certain area of Philadelphia, in violation of Section 1983 of Title 42, United States Code, and Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Plaintiffs seek a variety of declaratory and injunctive relief. On March 16, 1982, the present Court of three judges, duly convened, held a final hearing on the merits. What follows constitutes the Court's findings of fact and conclusions of law.

### I.

Reapportionment of Pennsylvania's state legislature is governed by a provision of the state's constitution requiring that a Legislative Reapportionment Commission be constituted for the purpose of reapportioning the Commonwealth in each year following that in which the federal decennial census is reported. Pa.Const. art. 2, § 17(a). The commission is to consist of five members: the majority and minority leaders of both the state Senate and the state House of Representatives, or their designees, and a chairman selected by the first four members in a manner also provided by the state constitution. *Id.* § 17(b). Within ninety days of the certification of the name of the chairman to the Secretary of the Commonwealth, the officer of the Commonwealth who supervises elections, the commission must file a preliminary reapportionment plan. Within the next thirty days, the commission may make corrections and "[a]ny person aggrieved by the preliminary plan" may file exceptions to the plan. If exceptions are filed, the commission has another thirty days from the date of the filing of the exceptions to prepare and file a revised reapportionment plan with the Secretary of the Commonwealth. *Id.* § 17(c).

With the filing of a revised or final reapportionment plan, the principal work of the commission is finished. A person aggrieved by the final plan, however, may file an appeal directly to the Supreme Court of Pennsylvania within thirty days of the filing of the plan. If shown to be contrary to law, the plan may be remanded by the Supreme Court to the commission for correction. *Id.* § 17(d). If, however, the Supreme Court decides that the plan is not contrary to law, or if no appeal is taken, then the reapportionment plan "shall have the force of law and the districts therein provided shall be used thereafter in elections to the [Pennsylvania legislature] until the next reapportionment as required under this section . . . ." *Id.* § 17(e).

The 1980 United States Census reported that Pennsylvania had a population of 11,-866,728. *In re Reapportionment Plan for*

*the Pennsylvania General Assembly,* —— Pa. at —— n.5, 442 A.2d 661 at 666 n.5 (1981). Thus, each of Pennsylvania's 203 seats in the state House of Representatives, including the 29 seats allocable to the City of Philadelphia, would ideally represent 58,-456 people. *Id.* at 666. The United States Census also reported that the Hispanic population of Philadelphia increased from approximately 25,000 in 1970 to approximately 63,000 in 1980. Amended Complaint ¶¶ 19–20. Most of these 63,000 Hispanics live in the north central area of Philadelphia focused upon in this case. *Id.* ¶ 22.

In conformity with the requirements outlined above, defendant Legislative Reapportionment Commission ("Commission") was duly constituted in January and February of 1981. It consists of Senator Robert C. Jubelirer, Senate Majority Leader, Senator Edward P. Zemprelli, Senate Minority Leader, Representative Samuel E. Hayes, House Majority Leader, Representative James J. Manderino, House Democratic Whip, and the Chairman, selected by them, James O. Freedman, Dean of the University of Pennsylvania School of Law. Once formed, the Commission began its initial task of preparing a preliminary reapportionment plan. Public comment from interested citizens was sought at this stage as it often was throughout the process. *See* Chronology of the 1981 Pennsylvania Reapportionment Plan, Document No. 10, at 2, 3 [hereinafter cited as "Chronology"].

By the time the preliminary reapportionment plan was being prepared, defendant Democratic Party City Committee of Philadelphia ("City Committee") and defendant David Glancey, Chairman of defendant City Committee, had developed a number of suggestions on how to reapportion the City of Philadelphia which they sought to have included in the preliminary reapportionment plan. N.T. 53–54. These suggestions did not take the form of a comprehensive proposal having defined district boundaries with a supporting analysis of the size and composition of the populations in each district. Indeed, the closest the City Committee came to formulating a "plan" was to develop worksheets grouping wards and di-

visions preferably to be included within the same legislative district. N.T. 53–54.

Defendants Glancey and the City Committee knew, however, that the districts so proposed would split the vote of the Hispanic community among several districts and would leave little opportunity for the election of an Hispanic representative. Nevertheless, the objective of so distributing the Hispanic vote was not to cause the adoption of a final reapportionment plan in which the Hispanic vote was diffused. On the contrary, defendants hoped that the filing of a preliminary plan splintering the Hispanic vote would provoke a strong reaction from that community. The resulting outcry, it was hoped, would cause the Commission to adjust district boundaries in order to form a district with a larger Hispanic population. In a kind of domino effect, the adjustment of boundaries to form a district of greater Hispanic concentration would require corresponding adjustments in neighboring districts. It was hoped that among the districts redrawn would be those in an area of the city where the Democratic Party was doing battle with the Republican Party, and that the adjustments in those districts would result in districts drawn more favorably for the Democratic Party. N.T. 61–63; Exhibit P4 at 19–20.

The suggestions of the City Committee and defendant Glancey that embodied this strategy were never submitted directly to the Commission or any of its individual members, either formally or informally. N.T. 48, 56. Instead, defendant Glancey transmitted them verbally to defendant O'Donnell, who had been asked by Commission member James J. Manderino "to communicate . . . the views of folks in Philadelphia and also information, technical and otherwise, about what the impact of the reapportionment plan would be." N.T. 46, 58 & 75. Prior to the filing of the preliminary plan, however, defendants Glancey and O'Donnell never discussed the specific question whether an Hispanic district ought to be created. N.T. 90. Moreover, neither defendant Glancey nor defendant City Committee was shown to have played any

other part in the development of the Commission's preliminary reapportionment plan. *See* N.T. 43, 48–49, 66–67.

On August 20, 1981, the Commission filed its preliminary reapportionment plan. Exhibit P5. While many aspects of the preliminary plan provoked comment, the only aspect of importance here is that none of the proposed districts for the state House of Representatives had a population that was more than 15% Hispanic. Furthermore, while some of the City Committee's informally transmitted suggestions were incorporated in the preliminary plan, others were not. N.T. 46.

Over the next thirty days, the commission received approximately 300 exceptions to the preliminary plan. On September 24, 1981, the Commission held one of twelve public hearings it conducted on the reapportionment plan, and sixty-four interested citizens testified in support of their exceptions. Among those who filed exceptions and presented supporting testimony at the September 24, 1981 hearing were Angel Ortiz, counsel for plaintiffs in this case, and Wilfredo Rojas. *See* Chronology, Exhibit A. Mr. Ortiz and Mr. Rojas testified that the preliminary reapportionment plan failed to include a district in the House of Representatives that would permit Hispanics an opportunity to elect a representative, even though the increased number and concentration of Hispanics in north central Philadelphia would make such a district possible. *Id.* Also offered at that hearing was the testimony of James Mahoney, a co-ordinator of the Philadelphia Council of the AFL–CIO, who spoke in support of an alternative reapportionment plan for the City of Philadelphia that was prepared by the AFL–CIO. *See* Exhibits P1, P3. Included in that plan was a proposed district for the House of Representatives, the 180th legisla-

tive district, in which Hispanics would constitute about 54% of the population. N.T. at 29–30.

Eventually, on October 13, 1981, the Commission filed a final reapportionment plan that contained many changes apparently made in response to the various exceptions filed. *See* Exhibit P6. Among the boundaries readjusted were those of district 180. As a result, the district as defined in the Commission's revised plan would have a population that was about 40% Hispanic. N.T. at 9; Complaint ¶ 31.

This final reapportionment plan was challenged in twenty-nine petitions for review filed with the Supreme Court of Pennsylvania within the time allowed. One of these petitions for review was filed by several persons of Hispanic origin, including Wilfredo P. Rojas and Angel Ortiz, and two Hispanic organizations. *See* Chronology, Exhibit B. In that petition for review, appellants asserted that the final reapportionment plan unconstitutionally diluted the Hispanic vote in the vicinity of the proposed 180th legislative district. Appellants also filed a brief in support of their petition in which they requested an evidentiary hearing to permit appellants to present further evidence of racial discrimination. Chronology, Exhibit D.[1] Appellants' request for an evidentiary hearing was not granted, and oral argument on twenty-five of the petitions for review was held before that court on December 7, 1981. On December 29, 1981, the Supreme Court filed an opinion approving the plan and declaring it to have the force of law. *In re Reapportionment Plan for the Pennsylvania General Assembly, supra.* The ten applications for reargument, which included an application filed by the Hispanic appellants just mentioned, were denied. No appeal to the United States Supreme Court was taken.

1. The brief filed in support of the petition for review proposed an alternative reapportionment plan for north central Philadelphia, which has been referred to throughout this litigation as the "Sanchez Plan." *See* Chronology, Exhibit D; Complaint, Appendix ("Plan 4"). The Sanchez Plan proposed the creation of a legislative district with a population 58% Hispanic.

This alternative plan, however, had never been submitted to the Commission. Perhaps for that reason, plaintiffs did not offer this plan in evidence at the final hearing. Instead, the testimony and arguments at the final hearing reflected a demand by plaintiffs for a 56% Hispanic district. *See, e.g.,* N.T. 90–91.

On December 15, 1981, between the date oral argument was heard by the Pennsylvania Supreme Court and the date their decision was rendered, the event primarily responsible for this lawsuit occurred. Mr. Ortiz, counsel for plaintiffs here, conducted an interview, taped for television, of defendant Glancey. During that interview, defendant Glancey made a series of statements suggesting that the defendant City Committee had been very influential with defendant Commission in the process that led to the creation of the preliminary plan. Exhibit P4 at 14–15, 18–19. He then suggested that the "plan" thus submitted by defendant City Committee had been intentionally designed to split the Hispanic vote in north central Philadelphia. *Id.* at 19–22. As an explanation, defendant Glancey declared that City Committee's purpose in doing so was to provoke an outcry from the Hispanic community that would cause the Commission to make changes resulting in a final plan favorable to the Democratic Party. *Id.* at 18–19. Reference to this interview was absent from the briefs submitted to the Pennsylvania Supreme Court on behalf of the Hispanic appellants challenging the final plan, presumably because the brief was filed before the interview took place. *See* Chronology, Exhibit D. The interview *was* mentioned, albeit in a single sentence, in the Hispanic appellants' application for reargument, *see id.*, Exhibit F at 4, but that application was denied.

The present litigation was then commenced. Plaintiffs are four individual Hispanic voters who reside in north central Philadelphia, and an unincorporated association formed for the purpose of protecting the interests of Hispanic voters in reapportionment. Originally named as defendants were the Legislative Reapportionment Commission, the Democratic Party City Committee of Philadelphia, David Glancey and Robert O'Donnell. In a subsequent amendment to the complaint, plaintiffs added as a defendant the Secretary of the

Commonwealth of Pennsylvania, William R. Davis, who is ultimately responsible for the supervision of elections in Pennsylvania. In their complaint, as amended, plaintiffs allege that the final reapportionment plan was designed with the purpose and effect of diluting or 'diffusing the Hispanic vote of north central Philadelphia in violation of both 42 U.S.C. § 1983 and § 2 of the Voting Rights Act, 42 U.S.C. § 1973.

The centerpiece of plaintiffs' claims is the Glancey interview, and a transcript of that interview was attached to the original complaint. To reinforce the effect of defendant Glancey's remarks, plaintiffs attached to the complaint affidavits of persons swearing that they heard defendant Glancey make statements suggestive of intentional discrimination against Hispanics in the creation of the reapportionment plan. Finally, plaintiffs also attached copies of newspaper articles suggesting that the preliminary plan was the work of defendants Glancey, O'Donnell and the City Committee, and discriminated against Hispanics.

Soon after the suit was filed, a three-judge court was convened pursuant to 28 U.S.C. § 2284 which provides for the convening of a three-judge court "when an action is filed challenging the constitutionality of . . . the apportionment of any statewide legislative body." *Id.* § 2284(a). A motion for a temporary restraining order filed by plaintiffs was denied shortly thereafter, and an expedited schedule for briefing and a hearing on plaintiffs' motion for a preliminary injunction was established. On March 16, 1982, the matter finally came before the three-judge court for the hearing on plaintiffs' motion for a preliminary injunction. Since no evidence was to be offered other than what the parties intended to produce at that hearing, however, the hearing was treated, with the consent of all parties, as the final hearing on the merits. N.T. 16–17. At the hearing, plaintiffs called five witnesses and a defendant produced one.[2] Having already set forth in

---

**2.** Prior to trial, the deposition which plaintiffs sought of Dean James O. Freedman, Chairman of the Legislative Reapportionment Commis-

sion, was made subject to a protective order by reason of legislative immunity. *See* Rulings on

narrative form the Court's findings of fact, the Court now turns to a discussion of the issues to be resolved in reaching its decision.

## II.

Defendants have raised a variety of defenses which, if sustained, would obviate the need for a ruling on the merits of plaintiffs' claims.[3] With one exception, however, the Court will not decide the issues presented by the assertion of those defenses. While many of these defenses might ordinarily and logically be decided first, the weakness of plaintiffs' case on the merits makes resolution of the often difficult issues presented by the defenses both wasteful and unwise.[4]

One defense does merit resolution. On February 19, 1982, defendants Glancey, O'Donnell and City Committee filed a motion to dismiss them as defendants.[5] The argument made in support of this motion, simply stated, is that defendants Glancey, O'Donnell and City Committee do not play any part in Pennsylvania's reapportionment and election process, and thus have no power to provide plaintiffs with any relief. Since analysis of the relief requested dem-

onstrates the validity of this argument, the motion will be granted.

In their original complaint, plaintiffs sought three principal items of relief: 1) a declaratory judgment that the reapportionment plan adopted for the Pennsylvania State Legislature violates federal constitutional and statutory law in diluting the voting strength of Hispanics in Philadelphia; 2) preliminary and permanent injunctions against all steps taken under the plan that would permit the selection and election of candidates; and 3) an order directing the adoption of a reapportionment plan free of the alleged constitutional and statutory defects. Plaintiffs sought no monetary damages. In the amended complaint, filed after it became apparent that the defense now at issue would be raised, plaintiffs added a request for an order "[e]njoining preliminarily and permanently [defendants Glancey, O'Donnell and City Committee] from having special status in the process established ... for the creation of a constitutionally permissible plan." Amended Complaint, Prayer for Relief ¶ 4b.

None of the items of relief requested makes the joinder of defendants Glancey, O'Donnell and City Committee either neces-

---

Motions for Protective Orders, Document No. 23.

**3.** In summary, the defenses asserted by defendant Commission are as follows: (1) lack of capacity to be sued resulting from the assertedly automatic dissolution of the Commission following Pennsylvania Supreme Court approval of the final plan; (2) legislative immunity under *Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); and (3) the bar of res judicata arising from the decision of the Supreme Court of Pennsylvania approving the final plan. In addition to the defense discussed in the text, the defenses asserted by defendants Glancey, O'Donnell and City Committee include, first, a claim that plaintiffs' claims are barred because the evidence of intentional discrimination is not newly discovered, and second, collateral estoppel. Finally, defendant Secretary of the Commonwealth asserted the defense of laches.

**4.** Defendant Commission specifically requested that the Court rule on its defense of legislative immunity under *Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641

(1980). It is true, as the Commission argues, that such a course, if it led to a decision in the Commission's favor, might obviate the threat that future commissions would be subjected to the burdens of litigation. Nevertheless, where, as here, the case on the merits is weak, such a technical defense is less important to the litigation and receives less of the attention of the parties in briefing and argument. Consequently, the Court loses much of the same quality that is sought by requiring standing: "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Accordingly, the Court declines to decide the issue of the Commission's immunity.

**5.** The Court denied the motion at the March 4, 1982 pretrial conference without prejudice to the right of defendants to raise the issue again at a later stage of the proceedings. The defendants above named accordingly raised the arguments when the Court entertained all defendants' motions for involuntary dismissal under Fed.R.Civ.P. 41(b).

sary or proper. The declaratory relief sought, of course, requires no action on any defendant's part. An injunction affecting the process leading to Pennsylvania's primary elections could not conceivably run against these three defendants simply because they have no official duties or functions under the Pennsylvania Election Code, Pa.Stat.Ann. tit. 25 § 2600 *et seq.*, and thus could not do anything to affect the manner or timing of that process. Similarly, defendants Glancey, O'Donnell and City Committee do not occupy any position empowered by Pennsylvania law to control in any way the development of a final reapportionment plan for the state legislature. Finally, even if it had been shown that these three defendants did informally possess some "special status" that allowed them *de facto* to exert control over the development of the final plan—and such a showing was not made here—joinder would still be unnecessary: if the Court were to find it necessary to order the state to develop a new reapportionment plan free of constitutional and statutory defects, Pennsylvania would have to produce a plan meeting those criteria; if the plan thereafter submitted met those criteria, it would be of no moment that any of the three defendants participated in its creation. Under such circumstances, where certain defendants are clearly without authority or power to effect any of the relief sought by the plaintiffs, a motion to drop those defendants may properly be granted. *Committee for Public Education & Religious Liberty v. Rockefeller*, 322 F.Supp. 678, 685–686 (S.D.N.Y.1971); *Rakes v. Coleman*, 318 F.Supp. 181, 192–193 (E.D.Va.1970); 7 C. Wright & A. Miller, Federal Practice and Procedure § 1683, at 322–323 (1972). The Court will so order.

### III.

We turn now to the merits of plaintiffs' claims considered in light of the remaining

defendants' motion for involuntary dismissal under Fed.R.Civ.P. 41(b).[6] Under rule 41(b), any of a plaintiff's claims may be dismissed at the close of plaintiff's case if "upon the facts and the law the plaintiff has shown no right to relief." In deciding whether the facts set forth above entitle the plaintiffs before us to the relief they seek, we must first briefly review the applicable law.

Courts, in reviewing reapportionment plans, first focused on inequities caused by states' failures to adjust boundaries of voting districts to accommodate shifts in the distribution of the states' respective populations. *See, e.g., Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). It is now well established, however, that a reapportionment plan describing districts of substantially equal population may still be invalid if "conceived or operated as purposeful devices to further racial or economic discrimination." *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). In *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), the Supreme Court stated this principle in the following terms:

> State legislative districts may be equal or substantially equal in population and still be vulnerable under the Fourteenth Amendment. A districting statute otherwise acceptable, may be invalid because it fences out a racial group so as to deprive them of their pre-existing municipal vote. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). A districting plan may create multimember districts perfectly acceptable under equal

---

**6.** Defendants' motions under rule 41(b) were timely made at the close of plaintiffs' case. Because the Court deemed it beneficial, in light of the urgency of the matter, to conclude the hearing at a single sitting, and because the only evidence to be presented by any defendant was the brief testimony of a single witness, the court chose not to hear argument on defend-

ants' rule 41(b) motions until the close of all the evidence. The Court explicitly ruled, however, that defendants' motions would not be prejudiced by the Court's decision to hear defendants' evidence first. N.T. 100–102. Accordingly, we may properly rule on defendants' motions for involuntary dismissal as though no evidence had been offered by any defendant.

population standards, but invidiously discriminatory because they are employed "to minimize or cancel out the voting strength of racial or political elements of the voting population." *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965).

*Gaffney v. Cummings, supra*, at 751, 93 S.Ct. at 2330. To succeed on a claim based on the principle that a reapportionment plan is invalid despite the substantial equality of population among the districts, it is not enough to show merely that the *effect* of the reapportionment plan is to fence out, dilute or diffuse the vote of a racial or ethnic group. On the contrary, in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), it was clearly the position of at least five of the justices of the Supreme Court that to prevail under either § 2 of the Voting Rights Act or the Equal Protection Clause of the Fourteenth Amendment, plaintiffs must demonstrate that the reapportionment plan was designed *purposefully* to minimize or cancel out the voting potential of racial or ethnic minorities. *City of Mobile v. Bolden, supra*, at 60–62, 66–67, 100 S.Ct. at 1499–1500 (plurality opinion of Stewart, J.); *id.* at 94–95, 100 S.Ct. at 1514–1515 (White, J., dissenting). *See also Whitcomb v. Chavis, supra*, at 149, 91 S.Ct. at 1872.[7]

In the case before us, the only evidence of conduct remotely suggesting intentional discrimination against Hispanic voters is the series of statements made by defendant Glancey in the television interview. There he stated that he had made suggestions for incorporation in the *preliminary* plan that would have resulted in districts which diffused the Hispanic vote. *See* Exhibit P4 at 19–21. Defendant Glancey, however, had no power to control the design of either the preliminary or final reapportionment plan, for under Pennsylvania law, that power resides exclusively with the Legislative Reapportionment Commission. Thus, to prevail on the merits, plaintiffs do not make out their case by simply stating that Glancey held the views that the plaintiffs complain of, or that he communicated them to persons who communicated them to the Commission, or that he personally spoke of them to a Commission staff member or a member of the Commission itself. Rather, plaintiffs must point to *some* evidence that the intent of Glancey was shared or adopted by the Commission, not only in the development of the preliminary plan but in the development of the final plan as well. The record is barren of any such evidence.

Plaintiffs urge the Court to bridge the gap in the evidence of intent by drawing an inference from the circumstances shown. First, plaintiffs point out that defendant Glancey did offer suggestions to the Commission with the purpose of having produced a preliminary plan that fractured the Hispanic vote. Plaintiffs further note that the preliminary plan filed did break up the Hispanic vote so that no district had a population that was more than 15% Hispanic. Plaintiffs then argue that since the Commission thereafter was shown that a district with a 56% Hispanic population *could* be created, but nevertheless filed a final plan wherein no district contained more than a 40% Hispanic population, the Commission must have intentionally discriminated against Hispanics in response to Glancey's preferences.

Plaintiffs' argument cannot survive even the most cursory examination. Whatever the Commission's reasons for drawing a preliminary plan, without a district of more than 15% Hispanic population, there remains the unalterable truth that the Commission revised that plan to provide for a district with a significantly greater proportion of Hispanic voters equal to 40% of the district's population. It is more reasonable to infer from such a marked upward adjustment that the Commission considered the views of Hispanics and did what it could to accommodate them, than it is to infer that

---

7. No federal constitutional right exists which guarantees racial or ethnic minorities proportional representation by members of their own groups. *See City of Mobile v. Bolden, supra*, at 75–80, 100 S.Ct. at 1504–1507 (plurality opinion), *id.* at 86–92, 100 S.Ct. at 1510–1513 (Stevens, J., concurring). *See also Whitcomb v. Chavis, supra*, at 156–160, 91 S.Ct. at 1875–1877.

the Commission embraced the views of defendant Glancey. That the Commission failed to provide for a district containing the maximum possible concentration of Hispanic voters does not weaken the inference that the Commission acted properly. Reapportionment brings into play a variety of competing considerations—ethnic, racial, political, economic and otherwise. Compromise is of the essence of the process. Plaintiffs here have not shown that such competing considerations did not exist and cause the Commission to create a district with less than the maximum possible Hispanic population. In the absence of such a showing, the Court cannot conclude that the Commission's failure to create a 56% Hispanic district resulted from purposeful discrimination rather than from necessary accommodation. Accordingly, the motions of defendant Commission and defendant William R. Davis for involuntary dismissal must be granted.

One more point, however, needs to be addressed. Plaintiffs have frequently denounced the conduct of defendants Glancey and the City Committee in channelling suggestions to the Commission that would intentionally minimize Hispanic voting strength in the preliminary reapportionment plan. It is not the business of the Courts to judge either the wisdom, the fairness, or the effectiveness of the political strategy adopted by defendants Glancey and the City Committee. Under our system, the only question properly before the Court in a reapportionment case such as this is whether or not the reapportionment plan adopted is valid under the law in the face of the particular challenge made, as it is in this case. Nevertheless, it must be said that organizations like the City Committee and individuals like defendant Glancey hold the same right held by plaintiffs to communicate their views on reapportionment. Moreover, an individual or organization does not lose its freedom to submit its suggestions just because the suggestions were motivated by considerations which, if shared or adopted by the state, would result in an invalid reapportionment plan. It is the state, or its designated agency, that must guard against the adoption of an un-constitutional plan, and how the state treats suggestions made does not affect a person's right to make them.

## IV.

Plaintiffs have endeavored with understandable zeal to obtain a representative in their state's legislature. Defendant Commission heard their position and apparently tried to accommodate those concerns. The plaintiffs' failure to get all they sought is hardly unusual where reapportionment is concerned. As in the ordinary settlement of litigation, the usual mark of success in reapportionment is that no interested group is completely happy with the result.

Plaintiffs' case fails on two grounds. First, plaintiffs have joined three defendants—defendants Glancey, O'Donnell and the City Committee—who are legally incapable of providing any appropriate relief. Moreover, as to the other defendants, plaintiffs have utterly failed to provide the barest trace of evidence to support their claim that defendant Commission designed the legislative districts in Pennsylvania with the *intent* to discriminate against Hispanic voters. For both reasons, plaintiffs' claims must be dismissed.