129 P.3d 1213

**In the Matter of the Petition for Alternative Writ of Prohibition Challenging the Idaho Legislative Reapportionment Plan of 2002 (Plan L 97) and for Declaratory and Injunctive Relief.**

**BONNEVILLE COUNTY, a political subdivision of the State of Idaho, by the Board of Bonneville County Commissioners, Roger Christensen, Dave Radford, and Lee Staker, et al., Petitioners,**

v.

**Ben T. YSURSA, Secretary of State, State of Idaho, Respondent.**

No. 30236.

Supreme Court of Idaho, Boise, November 2005 Term.

Dec. 28, 2005.

See also 136 Idaho 542, 38 P.3d 121 and 137 Idaho 870, 55 P.3d 863.

Runft & Steele Law Offices, Boise, for petitioners. John L. Runft argued.

Honorable Lawrence Wasden, Idaho Attorney General, Boise, for respondent. Brian P. Kane argued.

JONES, Justice.

In our Republic, representation in state government is governed by the principle of one person, one vote. This means that the districts from which state representatives are elected must be roughly equal in population. It also means that districts cannot be drawn so that they effectively dilute the right to vote. Our state constitution and statutes place other restrictions on the drawing of legislative districts, as well. Since 1994, the task of drawing legislative districts has been delegated to the state Commission for Reapportionment. After two of its plans were deemed unconstitutional, the Commission for Reapportionment filed Plan L97 in 2002. Petitioners in this case, various county boards of commissioners, voters, and state representatives, filed a petition in this Court contending that Plan L97 violated both the federal one person, one vote requirement and our state constitutional and statutory provisions controlling the district-drawing process. We have original jurisdiction in such a suit, Idaho Const. art. III, § 2(5), and we hold Plan L97 is not unconstitutional.

## I.

In 1993 the people of Idaho ratified an amendment to Idaho Const. art. III, § 2 to create a Commission for Reapportionment. 1993 Idaho Sess. Laws p. 1530 (S.J.Res. No. 105); *Bingham County v. Comm'n for Reapportionment*, 137 Idaho 870, 871, 55 P.3d 863, 864 (2002). Under the amendment, the Commission's task is to devise and file with the Secretary of State its plan for apportioning the senate and house of representatives of the State Legislature. Idaho Const. art. III, § 2(4). Pursuant to subsection (3) of the amended § 2, the Legislature in 1996 enacted laws to guide the Commission in pursuit

of its task. *See* I.C. §§ 72–1501–1508. The plan needs no legislative approval; it becomes effective upon filing. Idaho Const. art. III, § 2(5).

In 2001, the Commission adopted Plan L66, but its maximum population deviation[1] was 10.69 percent and therefore presumptively unconstitutional. *Smith v. Idaho Comm'n on Redistricting,* 136 Idaho 542, 38 P.3d 121 (2001). The Court, faced with no State-produced evidence to overcome the presumption, held the plan unconstitutional. *Id.* at 545, 38 P.3d at 124. A year later, the Commission adopted Plan L91. *Bingham County v. Comm'n for Reapportionment,* 137 Idaho at 872, 55 P.3d at 865. Plan L91, however, had a maximum population deviation even greater than its predecessor. *Id.* The Commission explained that the deviation resulted from its attempt to maintain the integrity of Madison and Fremont Counties (though the principle of maintaining counties as whole was not applied to Bingham County) and traditional neighborhoods and local communities. *Id.* at 872–73, 55 P.3d at 865–66. This came at the expense of neighborhoods and communities within Bingham County. *Id.* at 873, 55 P.3d at 866. Thus the plan, which kept intact some counties, neighborhoods, and communities, but separated others, was unconstitutional. *Id.*

We directed the Commission to reconvene and adopt a plan that met the constitutional requirements. *Bingham County,* 137 Idaho at 878, 55 P.3d at 871. In March 2002, the Commission filed Plan L97, the plan at issue in this case. Seven days after the Commission filed its report, Petitioners filed petitions in this Court challenging the plan. On March 22, 2002, we issued an order which, among other things, indicated Plan L97 to be presumptively constitutional because it contained an overall population deviation of less than 10% and indicated that the Petitioners had presented insufficient facts to demonstrate otherwise. On March 29, 2002, the Court issued a further order stating that

"factual issues have been raised that would likely require the development of a record through appointment of a special master or referral to a district court." In December 2003, Petitioners filed a petition for alternate writ of prohibition and sought declaratory and injunctive relief. In March 2004, we issued an order appointing a special master to compile the factual record which we deemed necessary to assist us in determining the plan's constitutionality. After a series of hearings, the special master submitted his report in September 2004.

## II.

### A.

■ Plan L97 is based on the 2000 census. Idaho's population, according to that survey, was then 1,293,953 individuals. Our state is divided into thirty-five legislative districts, from each of which one state senator and two members of the state house of representatives are elected. Idaho Const. art. III, § 4; I.C. § 67–202. Basic math tells us that if all districts were populated equally, each would contain 36,970 people. Courts recognize precise mathematical equality in each district is not attainable. *See Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506, 536 (1964). Hence, minor deviations are allowed. *See Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 2696–96, 77 L.Ed.2d 214, 221–22 (1983). So, to measure compliance with one person, one vote, we first look to a particular plan's overall maximum population deviation. If the maximum population deviation is less than ten percent, we say the plan is presumptively constitutional under the Federal Constitution. *Hellar v. Cenarrusa,* 106 Idaho 586, 589, 682 P.2d 539, 542 (1984). In Plan L97, sixteen districts have populations less than the ideal; eighteen have more; one has no measurable percentage deviation. The greatest positive deviation is 4.18 percent; the greatest negative deviation is –5.53 per-

---

1. Maximum population deviation expresses the difference between the least populous district and most populous district in terms of the percentage those districts deviate from the ideal district size. (The ideal district size is calculated by dividing the total population by the number of districts.) For example, if among thirty-five districts, the least populous district is four percent below the ideal, and the most populous district is four percent above the ideal, the maximum population deviation would be 4–(–4), or eight percent.

cent. The total maximum population deviation, then, is 9.71 percent and Plan L97 is presumptively constitutional under the Federal Constitution.[2]

We say "presumptively" constitutional because a plan whose maximum population deviation is less than ten percent may nonetheless be found unconstitutional if a challenger can demonstrate that the deviation results from some unconstitutional or irrational state purpose. *Rodriguez v. Pataki*, 308 F.Supp.2d 346, 365 (S.D.N.Y.2004) (three-judge court). And, while the purpose of one person, one vote is to protect voters, not regions, *Reynolds*, 377 U.S. at 562, 84 S.Ct. at 1382, 12 L.Ed.2d at 527 a plan will be held unconstitutional where the individual right to vote in one part of a state "is in substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Id.* at 568, 84 S.Ct. at 1385, 12 L.Ed.2d at 531; *see also Hadley v. Junior College District*, 397 U.S. 50, 54, 90 S.Ct. 791, 794, 25 L.Ed.2d 45, 49 (1970); *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F.Supp. 1022, 1035 n. 12 (D.Md.1994) (three-judge court) (suggesting regional discrimination may render plan unconstitutional if it dilutes individual's right to vote). The State need not justify the deviation merely upon the challenge to the plan. *Marylanders*, 849 F.Supp. at 1031. Instead, the challenger holds the burden to prove that that the deviation resulted from an unconstitutional or irrational state purpose or that the strength of voters' votes has been diluted. *Karcher v. Daggett*, 462 U.S. 725, 740–44, 103 S.Ct. 2653, 2663–66, 77 L.Ed.2d 133, 146–51 (1983).

### B.

Petitioners first claim Plan L97 contains an excessive "regional deviation" favoring "north" Idaho, which renders Plan L97 unconstitutional. According to Petitioners, the districts with negative population deviations are concentrated in ten of the eleven "northernmost" districts of the State, effectively leaving these districts underpopulated while overpopulating the districts outside the region. The result, say Petitioners, is that "north" Idaho gets 1.6 representatives more than that region's population would entitle it. They explain that the eleven "northernmost" districts have a total of 13,318 fewer people than if those districts were each of the ideal size, 36,970. The total population in the remaining districts is 13,321 more than if each were the ideal size. Thus the total deviation between the eleven "northern" districts and the other districts is 26,639 individuals—about seventy-two percent of a whole ideal district. They then make their additional 1.6 representatives appear as follows:

> This cumulative total regional deviation is magnified when the number of northern districts (11) is considered as a percentage (31.4%) of the total districts (35) in the State. The 26,639 person advantage is concentrated in the 11 northern legislative districts, which comprise approximately one-third of the legislative districts of the State. If the population of the 11 northern districts were equal to the rest of the State, then the advantage to the voters in said northern districts would be equal to having 72% of an additional district in that northern region. However, these northern districts together contain a population approximately equal to half of the southern districts.[3] Consequently, the deviation on a per vote regional advantage is further magnified by approximately two times to become, in effect, a cumulative 58,121 person advantage for the northern 11 legislative districts. This advantage is, from the regional standpoint, 1.5721 times the ideal district.

We're not entirely sure we follow this explanation, but Petitioners' point seems to be that if each of the "northern" districts were populated more closely to the ideal, those districts would be geographically larger, thereby shifting the number of districts south and to the east. Under the current

---

**2.** Petitioners have not argued or presented authority on whether Idaho's constitution affords voters more protection than the federal courts have provided under the Federal Constitution.

**3.** By "approximately equal to half" the petitioners mean roughly 43.7 percent (393,352 is 43.7 percent of the difference between the total population of Idaho, 1,293,953 and 393,352, which is 900,601).

plan, they appear to argue, "north" Idaho has too many districts and thus the relative voting strength of a voter in non-"northern" regions is diluted.

We find it worthwhile to first discuss the Petitioners' definition of "north" Idaho. It has been said that our state, mountainous and expansive and sparsely populated,[4] is divided into three regions: north, southwest, and southeast. *See Hellar v. Cenarrusa,* 106 Idaho 571, 580, 682 P.2d 524, 533 (1984) ("Appendix A," taking judicial notice of several facts relating to Idaho geography, culture, religion, and politics, and concluding that Idaho is "sectionalized" into three regions). Each region is tied in some fashion to the major city nearest it—Spokane for north Idaho, Boise for the southwest, and Salt Lake City for the southeast. *Id.* Petitioners' definition of "north" Idaho includes districts that stretch from the State's northern border (District 1) to as far south as Payette and Fruitland (District 9), Caldwell (District 10), and Emmett and Middleton (District 11). We know of no official delineation of Idaho's regions and we are certainly not the state's geography experts, but we are familiar enough with the map of our state to find it something of a stretch to categorize Payette, Fruitland, Caldwell, Emmett, and Middleton as part of "north" Idaho.

Even operating under the geographic definition Petitioners have given us, we are unable to conclude they have demonstrated that the "regional deviation" creates constitutional problems for Plan L97. Petitioners' argument and the facts in this case are similar to the argument and evidence in *Rodriguez v. Pataki, supra.* In *Rodriguez* a three-judge panel of the Southern District of New York ruled that in the absence of evidence of an unconstitutional or irrational state purpose for deviating from mathematical equality, a plan that arguably favored one region of the state but remained within the ten percent margin was not unconstitutional. The plaintiffs argued that the apportionment plan underpopulated the "upstate" senate districts and gave upstate New Yorkers an additional representative. 308 F.Supp.2d at 366.[5] They asserted that the systematic underpopulation of upstate districts lacked any permissible or rational purpose and was, under *Reynolds v. Sims,* invidious discrimination. *Id.* The court ruled that the mere fact of overpopulation and underpopulation did not allow it to conclude the differences were "driven by regional discrimination rather than other permissible considerations." *Id.* at 368. Moreover, while the court was willing to accept the notion that perhaps "regionalism" could dilute the right to vote, *Rodriguez,* 308 F.Supp.2d at 369 (citing *Marylanders,* 849 F.Supp. at 1039 n. 12), the court was unwilling to accept the plaintiffs' definition of "upstate" and "downstate," and observed that even if all districts were populated equally, New York City would have 26.2 seats instead of the 26 seats it had under the challenged plan. *Id.*

Similarly, in *Marylanders,* the plaintiffs challenged Maryland's senate districts contending that the plan's drafters consciously attempted to provide Baltimore with eight seats, when that city's population was not sufficient to support that many seats. *Marylanders,* 849 F.Supp. at 1035. Whether this was a permissible objective was an "interesting question," *id.* (citing *Legislative Redistricting Cases,* 331 Md. 574, 629 A.2d 646, 658 n. 19 (1993)), but not necessary to decide since the plaintiffs, the court ruled, had not satisfied the causation element. *Id.* at 1035. The court was unconvinced that attempts to maximize a region's representation were necessarily unconstitutional; the question was whether doing so substantially diluted an individual's vote. *Id.* at 1035 n. 12. Unable

---

4. At 83,570.08 square miles, Idaho's population density (as of 2000) was 15.6 persons per square mile, earning the Gem State the distinction of ranking 44th in population density. *See* http://www.census.gov. Roughly sixty-three percent of Idaho is federally owned. 2005–06 *Idaho Blue Book,* p. 296. This figure includes the lower 48's largest contiguous wilderness area, the 2.3–million–acre Frank Church–River of No Return Wilderness in central Idaho. *See*

http://www.fs.fed.us/land/staff/lar/LAR04/table7.htm.

5. The average overpopulation of the "downstate" districts was 2.37 percent (68.8 percent of a district); the average underpopulation of the "upstate" districts was 2.86 percent (68.57 percent of a district).

to find any evidence that the deviation was intentional, the court declined to rule the plan unconstitutional. *Id.* at 1036.

In this case, the individuals in the "northern" districts constitute 30.4 percent of Idaho's total population, and they are represented by eleven districts. Based on their population, they are entitled to 10.64 districts. On the other side of this coin, individuals outside the "northern" region comprise 69.6 percent of the population, and they are represented by twenty-four districts. Based on their population, non-"northern" residents are entitled to 24.36 districts. Indeed, under Plan L97, the number of districts in any region corresponds quite closely to the number of people therein.

Put differently, if the total amount of underpopulation in the "northern" region is spread evenly among each "northern" district, each of the "northern" districts deviates –3.27 percent from the ideal. If the total amount of overpopulation of the non-"northern" region is spread evenly among each of the non-"northern" districts, each deviates 1.5 percent from the ideal. If the state is divided into the two regions ("north" and not-"north"), the maximum population deviation between any "northern" district and any non-"northern" district is 4.77 percent.[6] The petitioners contend that the regional deviation by itself proves a "material failure on the part of the Commission to meet its duty to distribute the negative deviations as evenly as reasonably possible across the state." First, we find no authority for the argument that the Commission had a duty to spread negative deviations as evenly as possible across the state.

Second, according to *Rodriguez* and *Marylanders,* a regional deviation, by itself, is not enough to overcome the presumption of constitutionality. In this case, the numerical discrepancies between districts in the "northern" region and the rest of the state do not demonstrate that the "regional deviation" is significant enough to effectively dilute the right to vote for non-"northern" Idaho voters, and the record is devoid of any evidence tending to show that the Commission intentionally favored one region to the detriment of another.

The cases in which the petitioners seek comfort are distinguishable and do not help their case. *Vigo County Republican Cent. Comm. v. Vigo County,* 834 F.Supp. 1080 (S.D.Ind.1993), contained a critical element not present here: proof that the redistricting commission's plan was the product of "an effort to dodge [the] suit rather than to fulfill [its] constitutional obligations...." 834 F.Supp. at 1085. The apportionment plan in that case initially had a deviation of thirty-seven percent, and was re-drawn only after suit was filed, and the single goal in redrafting it was to achieve a population deviation less than 10 percent. *Id.* Had the plan started out with a deviation less than 10 percent, the presumption would have applied. *Id.* Without the presumption, and in the absence of any explanation other than the goal of attaining a ten-percent deviation, the drafters had failed their duty to draw the districts with populations as close to equal as possible. *Id.*

We recognize that Plan L97 is the result of two successful challenges to the Commission's previous plans. However, there is no allegation of any affirmative attempt to dodge any suit. The Commission's sole goal was not simply to draw a plan whose maximum population deviation was less than ten percent. Rather, the record demonstrates that the Commission was attempting to satisfy several requirements placed on it. The Commission was mindful of keeping counties intact—a permissible state interest under *Reynolds,* 377 U.S. at 568–69, 84 S.Ct. at 1385, 12 L.Ed.2d at 531, and a high priority under our laws. With forty-four counties, the Commission noted that achieving population equality and keeping counties intact is

6. The eleven "northern" districts contain, cumulatively, 13,318 fewer people than what eleven ideal districts would contain. Dividing 13,318 by the total of eleven ideal districts (406,670) yields a percentage deviation of 3.27 percent. The twenty-four non-"northern" districts contain, cumulatively, 13,321 people more than what twenty-four ideal districts would contain. Dividing 13,321 by the total contained in twenty-four ideal districts (887,280) yields a percentage deviation of 1.5 percent.

made more difficult. The Commission's task was made all the more difficult by Idaho's famous and formidable topographic, geographic, and population features.

*Hulme v. Madison County*, 188 F.Supp.2d 1041 (S.D.Ill.2001) is distinguishable for the reasons the Secretary points out: there was in that case an express finding that the apportionment process was "characterized by threats, coercion, bullying and a skewed view of the law." 188 F.Supp.2d at 1044. No such allegation or finding exists in the record. Finally, *Larios v. Cox*, 300 F.Supp.2d 1320 (N.D.Ga.2004) (three-judge court) is similarly unhelpful to the petitioners' case. In that case, the motivation for drawing districts that favored rural and inner-city Georgians was admitted in a substantial amount of testimony by the drafters. 300 F.Supp. at 1327–28. There was an admitted, deliberate attempt to keep rural south Georgia from losing seats. *Id.* The petitioners have presented no evidence of an intent to underpopulate the "northern" districts to affect the amount of districts in any particular area.

### III.

■ In addition to the federal requirements of district-drawing, our state constitution prescribes certain stipulations. Idaho Const. art. III, § 5 provides:

A county may be divided in creating districts only to the extent it is reasonably determined by statute that counties must be divided to create senatorial and representative districts which comply with the constitution of the United States. A county may be divided into more than one legislative district when districts are wholly contained within a single county.

We have interpreted this provision to mean that the constitution "prohibits the division of counties, except to meet the constitutional standards of equal protection." *Bingham County v. Comm'n for Reapportionment*, 137 Idaho at 878, 55 P.3d at 871. In *Bingham County*, we examined Idaho Const. art. III, § 5 and explained that

[a] county may [not] be divided and aligned with other counties to achieve ideal district size if that ideal district size may be achieved by internal division of the county. Whether desirable or not, that is the meaning of Article III, § 5. A county may not be divided and parsed out to areas outside the county to achieve the ideal district size, if that goal is attainable without extending the district outside the county.

137 Idaho at 874, 55 P.3d at 867.

In this case, the Commission found that Kootenai County could be divided into three districts wholly contained within the county and still comply with the one person, one vote requirement. (Bingham, Bonneville, Canyon, and Twin Falls Counties had to have one not-wholly contained district in order to comply with the one person, one vote requirement.) Nevertheless, Kootenai County contains four districts, three of which are wholly within the county and one of which contains part of Kootenai County and Bonner, Benewah, and Shoshone Counties. The Commission articulated two justifications for the split: (1) to "accommodate[ ] compliance with the one person/one vote requirement of the United States Constitution by adding population to District 2 which thereby reduces the negative population deviation in those districts"; and (2) to "allow[ ] the entire Coeur d'Alene Reservation to be included in a single district (District 2)."

Petitioners argue that since Kootenai County can be divided into three districts and still meet the one person, one vote requirement, dividing Kootenai County into three-plus districts to reduce the negative deviation in District 2 and keep intact the Coeur d'Alene Reservation violates Idaho Const. art. III, § 5. The Secretary, on the other hand, asserts that the Court determined in a previous order that the plan divides counties only to the extent necessary to comply with the mandates of the Equal Protection Clause and Idaho Const. art. III, § 5. The Secretary also hints that splitting the Coeur d'Alene Reservation would create vote-dilution problems, but does not elaborate.

The Secretary's defenses are misplaced. First, the order asserted by the Secretary was not conclusive. The order specifically noted that insufficient facts had then been

presented to demonstrate that the Petitioners had carried the burden of overcoming the presumption of constitutionality. We acknowledged the presumptive constitutionality of the plan, but noted: "factual issues have been raised that would likely require the development of a record through appointment of a special master or referral to a district court." We cannot reasonably read our order to convey an intent to foreclose the possibility that the plan, though presumptively constitutional, nonetheless violated the constitution.

■ Second, we can find no outright prohibitions against splitting an Indian reservation. The Voting Rights Act, 42 U.S.C. § 1973, is aimed at protecting the Fifteenth Amendment's guarantee that the right to vote shall not be abridged or denied on account of race or color. *Voinovich v. Quilter*, 507 U.S. 146, 152–53, 113 S.Ct. 1149, 1154–55, 122 L.Ed.2d 500, 510 (1993). A violation occurs only if an apportionment plan effectively denies a protected class the equal opportunity to elect the class' candidate of choice. *Id.* at 153, 113 S.Ct. at 1155, 122 L.Ed.2d at 510 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25, 44 (1986)). A vote-dilution claim under the Fourteenth Amendment is viable only if the claimants can prove the plan is the result of intentional discrimination against an identifiable group. *Hispanic Coalition on Reapportionment v. Legislative Reapportionment Comm'n*, 536 F.Supp. 578, 584–85 (E.D.Pa.1982) (aff'd 459 U.S. 801, 103 S.Ct. 32, 74 L.Ed.2d 46 (1982)). There is no evidence that splitting the Coeur d'Alene Reservation would implicate either the Voting Rights Act or the Fourteenth Amendment. Besides, members of the Coeur d'Alene tribe are not parties to this action.

■ Nevertheless, we see no violation of Idaho Const. art. III, § 2. The record demonstrates that if Kootenai County were not split into three-plus districts, some other county would have to be split so that the other county did not have all its districts wholly contained within it. In Plan L97, Kootenai County supplies 2,086 people to District 2. District 2 has a negative deviation of 3.9 percent. Taking that portion of Kootenai County away from District 2 would give District 2 a roughly 9.6 percent negative deviation. The other districts remaining the same, Plan L97 would thus have a maximum population deviation of 13.78 percent and be presumptively unconstitutional. In short, it seems compliance with both art. III, § 5 and the Equal Protection Clause can be had, but it requires a redrawing of more than just District 2 and nearby districts.[7]

The Commission had a choice to make, and justified its choice by favoring a statutory preference for keeping intact a community of interest. *See* I.C. § 72–1506(2). In this instance, the choice of which county to split in a manner that results in a district not being wholly contained within that particular county is a judgment that must be vested with the Commission. *Hellar v. Cenarrusa*, 106 Idaho 586, 588, 682 P.2d 539, 541 (1984) (apportioning the State Legislature "is, in the first instance, a matter of legislative discretion and judgment").[8] We simply cannot micromanage all the difficult steps the Commission must take in performing the high-wire act that is legislative district drawing. Rather, we must constrain our focus to determining whether the split was done to effectuate an improper purpose or whether it dilutes the right to vote. Neither has been shown. Therefore, our preference for deferring to the Commission compels us to resolve the issue in its favor.

## IV.

■ While we are on the subject of county splitting, we turn next to Petitioner's argument that the Commission needed statutory authority to split the counties it split

---

7. Indeed, Petitioner's plan does not demonstrate otherwise—it splits Clearwater County into two districts, neither of which is wholly contained in that county. In Plan L97, the whole of Clearwater County is in District 8.

8. Recall, *Hellar* was decided before the people delegated to the Commission the task of drawing legislative districts. We believe the same discretion and judgment that was vested in the Legislature when it was drawing districts applies to the Commission, unless otherwise limited by statute or the constitution.

in Plan L97. Idaho Const. art. III, § 5 provides that "a county may be divided in creating districts only to the extent it is reasonably determined *by statute* that counties must be divided to create senatorial and representative districts which comply with the constitution of the United States." (Emphasis added.) Petitioners contend that the Commission needed specific statutory authority to file a plan that split the counties it split.

Resolving this issue depends on what the people meant by "determined by statute." Specifically, the answer depends on whether I.C. § 72–1506 is the statute contemplated in art. III, § 5. That statute provides, in relevant part:

> Division of counties should be avoided whenever possible. Counties should be divided into districts not wholly contained within that county only to the extent reasonably necessary to meet the requirements of the equal population principle. In the event a county must be divided, the number of such divisions, per county, should be kept to a minimum.

I.C. § 72–1506(5). Petitioners contend the people intended to preserve the integrity of county boundaries by requiring a specific statute to ensure division of counties was necessary. They posit that section 72–1506 merely establishes criteria and provides no mechanism for making the requisite determination that a county needs to be divided. They illustrate their point by the Legislature's use of the word "should" in the statute instead of "shall." They also assert:

> the fact that th[e] ... duty and authority [to determine the necessity for county splits] was not delegated strongly [implies] an intent on the part of the framers to have the legislature retain some oversight and authority over the commission and the reapportionment process, particularly in regards to maintaining the integrity of the State of Idaho's political subdivisions in the face of reapportionment.

We do not believe the people intended to retain in the Legislature the kind of oversight the petitioners urge.

Instead, we believe I.C. § 72–1506 qualifies as the statute referenced in Idaho Const.

art. III, § 5. That statute recognizes the Legislature's authority to authorize the splitting of counties under art. III, § 5 and simultaneously facilitates the people's intent of removing the Legislature from the details of the district-drawing process, as evidenced in art. III, § 2. Petitioners' argument would have us insert into the district-drawing process a step not intended by the people: once the Commission drew a tentative map based on all the data, and decided it needed to split a few counties, it would have to obtain statutory authorization to actually do so. This would give the Legislature more than mere "oversight" of the process; it would effectively vest that body with authority to decide whether and when and which counties should be divided. It would also be contrary to art. III, § 2(5) wherein the people provided that the legislative districts created by the Commission "shall be in effect for all elections held after the plan is filed ... unless amended by court order." It is therefore clear to us that by amending art. III, § 2, the people intended to remove the Legislature from the details of the process. And it is not as if interpreting § 5 the way we have eliminates any oversight over county-splitting. The people provided judicial review in this Court for any challenges to an apportionment plan, *see* Idaho Const. art. III, § 2(5), the very mechanism Petitioners in this case invoked.

## V.

■ And finally, we move to Plan L97's seventy-eight precinct splits. This many splits, say the petitioners, violates I.C. § 72–1506(7)'s suggestion that "[d]istrict boundaries should retain, as far as practicable, the local voting precinct boundary lines to the extent those lines comply with the provisions of section 34–306, Idaho Code." To support their argument that seventy-eight precinct splits is excessive, the petitioners point out that twenty-two precincts were split in 1994, twenty-four in 1982, and five in 1974. They also offer their own plan, which splits thirteen precincts.

The Secretary argues that the Commission has discretion under I.C. § 72–1506(7) to split precincts and that writs of mandate and

prohibition will not issue to compel the performance of a purely discretionary function. *See Bopp v. City of Sandpoint,* 110 Idaho 488, 490, 716 P.2d 1260, 1262 (1986). He also argues that precinct-boundary integrity is subordinate to legislative-district drawing. The Commission stated that it "endeavored throughout to retain as far as practicable the local voting precinct boundary lines." This, along with Petitioners' own plan and the data about previous precinct splits, is the only evidence on precinct splits in L97.

As with their argument regarding the Kootenai County three-plus split, Petitioners have not explained how seventy-eight precinct splits in Plan L97 affect their right to vote. On the record as it exists, deciding whether the plan's seventy-eight precinct splits is excessive must be done on few facts and with little law to guide the way. The only Idaho case involving precinct splits was *Bingham County v. Comm'n for Reapportionment,* where the Court expressed no distress over a plan that divided two precincts in Bingham County, putting one in one district and another in another district, despite other alternative plans that did not split the precincts. 137 Idaho at 877, 55 P.3d at 870. To be sure, the petitioners' plan splits only thirteen precincts, all the while seeming to comply with the state and Federal Constitutions. This tends to indicate that seventy-eight precinct splits is not avoiding precinct splits "as far as practicable." And it would have been helpful for the Commission to better explain why it needed seventy-eight splits when previously less than a third of this number needed to be split (at least in the three years cited), but in light of the degree of deference we must afford the Commission, and in the absence of evidence that the precinct splits have harmed the right to vote, Petitioners have failed to show the Plan must be rejected.

## VI.

The Secretary raised other defenses to this challenge to Plan L97, but since we have held the plan constitutional, we need not entertain them. We hold Plan L97 is constitutional and therefore dismiss the petition. No costs, no fees.

Chief Justice SCHROEDER, Justices TROUT, EISMANN and BURDICK concur.

