# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket Nos. 49261, 49267, 49295 & 49353

BRANDEN JOHN DURST, a qualified elector of the State of Idaho,

    Petitioner,

and

CANYON COUNTY, a duly formed and existing county pursuant to the laws and Constitution of the State of Idaho,

    Intervenor-Petitioner,

v.

IDAHO COMMISSION FOR REAPPORTIONMENT, and LAWERENCE DENNEY, Secretary of State of the State of Idaho, in his official capacity,

    Respondents,

_____

ADA COUNTY, a duly formed and existing county pursuant to the laws and Constitution of the State of Idaho,

    Petitioner,

v.

IDAHO COMMISSION FOR REAPPORTIONMENT, and LAWERENCE DENNEY, Secretary of State of the State of Idaho, in his official capacity,

    Respondents.

_____

SPENCER STUCKI, registered voter pursuant to the laws and Constitution of the State of Idaho,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2022 Term

Opinion Filed: March 1, 2022

Melanie Gagnepain, Clerk

SUBSTITUTE OPINION, THE COURT'S PRIOR OPINION DATED JANUARY 27, 2022, IS WITHDRAWN

|  |  |
|---|---|
| Petitioner, | ) |
|  | ) |
| v. | ) |
|  | ) |
| IDAHO COMMISSION FOR | ) |
| REAPPORTIONMENT, and LAWERENCE | ) |
| DENNEY, Secretary of State of the State of | ) |
| Idaho, in his official capacity, | ) |
|  | ) |
| Respondents. | ) |
| _____ | ) |
|  | ) |
| CHIEF J. ALLAN, a registered voter of the | ) |
| State of Idaho and Chairman of the Coeur | ) |
| d'Alene, Tribe, and DEVON BOYER, a | ) |
| registered voter of the State of Idaho and | ) |
| Chairman of the Shoshone-Bannock Tribes, | ) |
|  | ) |
| Petitioners, | ) |
|  | ) |
| v. | ) |
|  | ) |
| IDAHO COMMISSION FOR | ) |
| REAPPORTIONMENT, and LAWERENCE | ) |
| DENNEY, Secretary of State of the State of | ) |
| Idaho, in his official capacity, | ) |
|  | ) |
| Respondents. | ) |

Original proceeding before the Supreme Court of the State of Idaho.

The petitions are denied.

Bryan D. Smith, Smith Driscoll & Associates, PLLC, Boise, for petitioner, Branden Durst. Bryan D. Smith argued.

Bryan F. Taylor, Canyon County Prosecuting Attorney, Caldwell, for intervenor-petitioner, Canyon County. Alexis Klempel argued.

Jan M. Bennetts, Ada County Prosecuting Attorney, Boise, for petitioner, Ada County. Lorna Jorgensen argued.

Spencer Stucki, petitioner *pro se*.

Deborah A. Ferguson and Craig Durham, Ferguson Durham, PLLC, Boise, for petitioners Chief J. Allan and Devon Boyer. Deborah A. Ferguson argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondents, Idaho Commission for Reapportionment and Lawerence Denney. Megan A. Larrondo argued.

———————————

STEGNER, Justice.

This case arises out of multiple petitions challenging the constitutionality of Plan L03, the legislative redistricting plan adopted by the Idaho Commission for Reapportionment ("the Commission") following the 2020 federal census.

Under Article III, Section 2 of the Idaho Constitution, the six-member bipartisan Commission is tasked with creating 35 new legislative districts after each decennial federal census. These districts, collectively referred to as a "plan," must conform to the requirements set forth by the Federal Constitution, the Idaho Constitution, and statute. Petitioners generally argue that Plan L03 splits more counties than is required to comport with federal constitutional requirements, rendering Plan L03 unconstitutional under the Idaho Constitution. The petitions were filed before this Court, which has original jurisdiction over them pursuant to Article III, Section 2 of the Idaho Constitution. Petitioners request that this Court issue a writ of prohibition to restrain the Secretary of State from transmitting a copy of the Commission's Final Report and Plan L03 to the President Pro Tempore of the Idaho Senate and the Speaker of the Idaho House of Representatives. For the reasons discussed below, we decline to issue such a writ.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Every ten years, the federal government conducts a national census. When the results of that census are available, Article III, Section 2 of the Idaho Constitution requires a six-member bipartisan commission be formed to draw new electoral district boundaries. IDAHO CONST. art. III, § 2. Idaho received the results of the 2020 federal census on August 12, 2021. That same day, the Secretary of State entered an order establishing the Idaho Commission for Reapportionment. The six members of the Commission convened on September 1, 2021.

On November 5, 2021, after weeks of traveling around the state and holding public hearings seeking feedback from residents, the Commission unanimously voted to adopt Plan L03. On November 10, 2021, the Commission "reaffirmed its adoption" of Plan L03, adopted its "Final Report," and adjourned. The Commission filed its Final Report with the Secretary of State's office on November 12, 2021.

3

On November 10, 2021, Branden Durst filed a verified petition against the Commission and the Secretary of State (collectively "the Respondents"), urging this Court to review Plan L03, conclude it violated Idaho's Constitution because it divided more counties than necessary to comply with the Equal Protection Clause, and adopt his proposed plan (L084). A week later, on November 17, 2021, Ada County filed a similar petition alleging Plan L03 violated Idaho's Constitution. On November 19, 2021, Respondents moved to consolidate the two cases. This Court granted Respondents' motion.

Spencer Stucki filed a *pro se* petition challenging L03 on December 1, 2021, alleging different areas of the state were treated unequally and that the Commission should have adopted a plan which split nine counties instead of eight.

Next, Chief J. Allan and Devon Boyer, leaders of the Coeur d'Alene and Shoshone-Bannock tribes respectively, filed a verified petition challenging Plan L03 on December 16, 2021, on the grounds it unconstitutionally divided more counties than necessary and failed to preserve, to the maximum extent possible, communities of interest as required by Idaho Code section 72-1506. Petitioners Allan and Boyer moved to consolidate their case with Durst and Ada County's. This Court granted the motion to consolidate, and additionally *sua sponte* consolidated Stucki's case, as all four petitions challenge Plan L03. This Court designated *Durst v. Idaho Commission for Reapportionment* as the lead case.

Finally, Canyon County filed a verified petition to intervene in *Durst's* case. This Court granted Canyon County's petition to intervene. No other petitions challenging the legislative redistricting plan were filed. The time for filing a petition challenging the Commission's legislative redistricting plan has now expired. The consolidated cases proceeded to argument before this Court.

## II.    STANDARDS OF REVIEW

"In accord with Article III, Section 2(5) of the Idaho Constitution, any registered voter, any incorporated city or any county in this state, may file an original action challenging a congressional or legislative redistricting plan adopted by the Commission on Reapportionment." I.A.R. 5(b). This Court has "original jurisdiction over actions involving challenges to legislative apportionment." IDAHO CONST. art. III, § 2.

> There is a hierarchy of applicable law governing the development of a plan for apportioning the legislature: The United States Constitution is the paramount authority; the requirements of the Idaho Constitution rank second; and, if the

4

requirements of both the State and Federal Constitutions are satisfied, statutory provisions are to be considered.

*Twin Falls Cnty. v. Idaho Comm'n on Redistricting*, 152 Idaho 346, 348, 271 P.3d 1202, 1204 (2012).

The burden to prove a plan is unconstitutional lies with the challenger to the plan. *See Bonneville Cnty. v. Ysursa*, 142 Idaho 464, 468, 129 P.3d 1213, 1217 (2005) (stating that "the challenger holds the burden to prove that [] the deviation resulted from an unconstitutional or irrational state purpose or that the strength of voters' votes has been diluted").

### III. ANALYSIS

**A. We first address whether Durst's petition is timely.**

Respondents argue that Durst's petition was untimely because it was filed prematurely. Durst filed his verified petition at 5:01 p.m. on November 10, 2021. Although the Commission voted to adopt Plan L03 on November 10, 2021, the Commission's Final Report was not officially filed with the Secretary of State until November 12, 2021.

On November 18, 2021, recognizing his petition may have been "'premature' because it was filed before the Final Report was filed with the Secretary of State," Durst filed a "motion for clarification" requesting that this "Court enter an order clarifying the status of his Petition for Review so that Petitioner will know whether the current pleading is timely or whether Petitioner will need to refile his Petition for Review." This Court denied Durst's motion on November 22, 2021, concluding that "the motion for clarification [was] an effort to obtain an advisory ruling from the Court. This Court decline[d] the invitation to provide an advisory opinion."

In their response brief, Respondents assert that Durst's petition was untimely because it was filed "two days *before* the Commission's Final Report was transmitted to the Idaho Secretary of State's Office." (Italics added.) In reply, Durst argues that his petition is timely because Idaho Appellate Rule 5(b) requires a petition be filed *within* thirty-five days of the filing of the Final Report but does not require that the petition be filed within the thirty-five days *after* the filing of the Final Report. Durst further contends that, even if his petition was filed early, pursuant to Idaho Appellate Rules 17 and 21 the Court should treat the petition "like a prematurely filed notice of appeal" which "became valid when the Final Report was filed with the Secretary of State."

Idaho Appellate Rule 21 states that

the failure to physically file . . . a challenge to a final redistricting plan with the clerk of the Supreme Court . . . within the time limits prescribed by [the Idaho

5

Appellate Rules], shall be jurisdictional and shall cause automatic dismissal of such appeal or petition, upon the motion of any party, or upon the initiative of the Supreme Court.

I.A.R. 21. Idaho Appellate Rule 5(b) governs the time limit for filing a challenge to a redistricting plan: "Such challenges shall be filed *within 35 days* of the filing of the final report with the office of the Secretary of State by the Commission." I.A.R. 5(b) (italics added).

While Durst's reading of the Rule may appear meritorious on its face, he neglects to consider Idaho Appellate Rule 22, which governs the computation of time. Rule 22 provides in relevant part:

In computing the time period prescribed or allowed for the filing or service of any document in these rules, the day of the act or event *after* which the designated period of time *begins* to run is not to be included, but the last day of the period so computed is to be included . . . .

I.A.R. 22 (italics added). In a redistricting challenge, the time period "begins to run" after the Commission's filing of its final report with the Secretary of State. I.A.R. 5(b). Rule 22 clearly does not contemplate a retrospective time period calculation.

Nevertheless, the fact that Durst filed his petition early is not fatal to his case. We have historically held that a notice of appeal filed prior to the entry of a written appealable judgment becomes valid once the written appealable judgment is entered. *See, e.g.*, *Spokane Structures, Inc. v. Equitable Inv., LLC*, 148 Idaho 616, 621, 226 P.3d 1263, 1268 (2021). Based on the circumstances here—showing that the Final Report was completed the day Durst filed his petition, but not yet officially filed with the Secretary of State's office until two days later—we see no reason to refrain from applying this principle here. I.A.R. 48 ("In cases where no provision is made by statute or by these rules, proceedings in the Supreme Court shall be in accordance with the practice usually followed in such or similar cases[.]"). Therefore, we hold Durst's petition became valid on November 12, 2021, after the Commission filed its Final Report with the Secretary of State's office. Accordingly, Durst's petition is timely, and we will consider its merits.

**B. Petitioners have failed to establish that the Commission "unreasonably determined" that Plan L03 comported with the federal and state constitutions.**

1. The Federal Constitution

Before we address Petitioners' arguments that the Plan violates Idaho's Constitution, we must initially determine whether the Plan complies with the Equal Protection Clause of the Federal Constitution. Our reasons for doing so are twofold. First, the hierarchy of applicable law governing

6

redistricting provides that the Equal Protection Clause of the Federal Constitution is the paramount authority. *Twin Falls Cnty.*, 152 Idaho at 348, 271 P.3d at 1204. Second, Idaho's Constitution prohibits the division of counties, except to meet the constitutional standards of equal protection. *Id.* at 349, 271 P.3d at 1205.

The United States Supreme Court has held that the Equal Protection Clause of the Federal Constitution requires the seats in both houses of a bicameral state legislature be apportioned on a population basis. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 578. While the Court recognized that a state may legitimately desire to maintain the integrity of various political subdivisions, "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* at 578-79. The Court later held that an apportionment plan with a maximum population deviation[1] under 10% was insufficient to make out a *prima facie* case of invidious discrimination under the Equal Protection Clause so as to require justification by the state. *Brown v. Thompson*, 462 U.S. 835, 842 (1983). A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the state. *Id.* at 842-43.

Based on the data gathered during the 2020 federal census, the population of the state of Idaho is 1,839,106. Idaho has thirty-five legislative districts. If Idaho's population was equally divided among the thirty-five districts, the "ideal district size" would be 52,546 people.[2] The Commission found that Plan L03 had a maximum population deviation of 5.84%, which is presumptively constitutional from an equal protection standpoint and is, in fact, the lowest

---

[1] "Maximum population deviation expresses the difference between the least populous district and most populous district in terms of the percentage those districts deviate from the ideal district size." *Bonneville Cnty.*, 142 Idaho at 467 n.1, 129 P.3d at 1216 n.1. "For example, if among thirty-five districts, the least populous district is four percent below the ideal, and the most populous district is four percent above the ideal, the maximum population deviation would be 4-(-4), or eight percent." *Id.*

[2] 1,839,106 divided by 35 is 52,545.89 people per district, rounded to two decimal places. *See Bonneville Cnty.*, 142 Idaho at 467 n.1, 129 P.3d at 1216 n.1 ("The ideal district size is calculated by dividing the total population by the number of districts."). Because it is impossible to include 0.89 people in a district, the Commission rounded up to the nearest whole number.

deviation for a plan ever adopted by a commission[3] in discharging its constitutional obligation. None of the petitioners contend that Plan L03 violates the Equal Protection Clause of the Federal Constitution.[4]

### 2. The Idaho Constitution

We next turn to the determination of whether L03 violates Article III, section 5 of Idaho's Constitution. Article III, section 5 of Idaho's Constitution guides our review of Petitioners' claims:

> A senatorial or representative district, when more than one county shall constitute the same, shall be composed of contiguous counties, and *a county may be divided in creating districts only to the extent it is reasonably determined by statute that counties must be divided to create senatorial and representative districts which comply with the constitution of the United States.* A county may be divided into more than one legislative district when districts are wholly contained within a single county.

IDAHO CONST. art. III, § 5 (italics added). As written, the phrase "reasonably determined by statute" suggests we should review the reasonableness of a "statute" to determine whether Plan L03 is constitutional. The phrase, however, is ambiguous because it is unclear to which statute it refers. From the outset, we are skeptical of any effort to seemingly allow a "statute" to control our interpretation of the Constitution in any respect, given that a statute constitutes "[a] lower ranking source of law in this hierarchy [and] is ineffective to the extent that it conflicts with a superior source of law." *Twin Falls Cnty.,* 152 Idaho at 348, 271 P.3d at 1204.

Further confusion exists because the phrase "by statute" has been previously interpreted by this Court in the following manner:

> [W]e believe I.C. § 72-1506 qualifies as the statute referenced in Idaho Const. art. III, § 5. That statute recognizes the Legislature's authority to authorize splitting of counties under art. III, § 5 and simultaneously facilitates the people's intent of

---

[3] The 2001 Commission originally adopted Plan L66, which had a maximum population deviation of 10.69%; Plan L66 was struck down by this Court in *Smith v. Idaho Commission for Reapportionment*. 136 Idaho 542, 544, 38 P.3d 121, 123 (2001). The 2001 Commission then adopted Plan L91, which had a maximum population deviation of 11.79%; Plan L91 was also struck down by this Court. *Bingham Cnty.*, 137 Idaho at 872, 55 P.3d at 865. The 2001 Commission then adopted, and this Court upheld, Plan L97, which had a maximum population deviation of 9.71%. *Bonneville Cnty.*, 142 Idaho at 468, 129 P.3d at 1217. Following the next census, the 2011 Commission adopted Plan L87, which had a maximum population deviation of 9.92%. Plan L87 was struck down by this Court in *Twin Falls County*. 152 Idaho 346, 271 P.3d 1202. The 2011 Commission subsequently adopted Plan L93, which had a maximum population deviation of 9.70% and remained in place until the current Commission adopted Plan L03.

[4] Petitioner Stucki seemingly contends that, had the statutory criteria in Idaho Code section 72-1506 been applied in such a way as to effectuate nine county splits, equal protection could have been better promoted. However, he concedes that Plan L03 complies with the Federal Constitution: "By holding tightly to the requirement to make districts as nearly equal in size with low deviations they [the Commissioners] were meeting the provisions of the United States and Idaho constitutions."

removing the Legislature from the details of the district-drawing process as evidenced in art. III, § 2.

*Bonneville Cnty.*, 142 Idaho at 473, 129 P.3d at 1222. As we are given the task of interpreting the phrase "reasonably determined by statute," we disavow this Court's prior interpretation of it in *Bonneville County* as an inaccurate statement of law.

In order to explain our disavowal, we need to delve into the history of article III, section 5. The Legislature, not the Commission, was responsible for redistricting in 1986. During the legislative session that year, the Legislature proposed amendments to article III, sections 2, 4, and 5 of the Constitution to permit the Legislature to vary the number of districts from 30 to 35, to prohibit floterial districts, and to essentially eliminate the anachronistic constitutional provision prohibiting the division of counties. H.R.J. Res. No. 4, 1986 Idaho Sess. Laws 869–70. The three proposed amendments were approved by Idaho's voters in the general election of 1986. The amendment of article III, section 5 allowed counties to be divided, but only to the extent that a duly adopted reapportionment *statute* reasonably determined county divisions to be necessary in order to comply with the Equal Protection Clause of the Federal Constitution.

At the time the amendment to article III, section 5 was approved by the voters in 1986, redistricting had been accomplished like any other legislation: by a legislatively passed and gubernatorially signed *statute*, which was codified in Idaho Code section 67-202. (Section 67-202, as it existed in 1986, was subsequently repealed in 2009 and is no longer in use today. Act effective July 1, 2009, ch. 52, § 1, 2009 Idaho Sess. Laws 135–36.) In other words, the legislature would create a redistricting plan, the entirety of which would be incorporated into a bill to amend Idaho Code section 67-202. If both houses passed the legislation and it was signed by the Governor, it would become law and define the boundaries of each legislative district until the next decennial census, unless it was established in court by an objecting party that the resulting districts were "unreasonably determined" by the Legislature.

Following the 1986 amendment to article III, section 5, the process by which the Legislature created legislative districts continued to utilize Idaho Code section 67-202. In 1992, the Legislature created a new redistricting plan and drafted a bill to amend the then-existing version of Idaho Code section 67-202. Both houses of the Legislature passed the bill, which was then signed by the Governor. Act of Mar. 2, 1992, ch. 13, § 2, 1992 Idaho Sess. Laws 32–38. Notably, the Legislature's 1992 redistricting plan split seventeen counties, notwithstanding the fact that the Legislature had to be aware of the recently amended article III, section 5 of the Idaho Constitution

9

which stated "a county may be divided in creating districts only to the extent it is reasonably determined by statute that counties must be divided. . ."

Given this history, it is clear that at the time of the 1986 amendment of article III, section 5, that the words "by statute" did not refer to Idaho Code section 72-1506 as we incorrectly concluded in *Bonneville County*, but instead referred to the then-existing Idaho Code section 67-202. As previously explained, that latter statute authorized the *Legislature* to reapportion the state's legislative districts. Accordingly, based on this analysis, we disavow the statement in *Bonneville County* which states the words "by statute" in article III, section 5 refer to Idaho Code section 72-1506. They do not.

Instead, the phrase "reasonably determined by statute" must now be interpreted in light of subsequent amendments to Idaho's Constitution which transferred the responsibility to redistrict Idaho from the Legislature to a citizen's commission. In 1993, the Legislature proposed amendments to article III, section 2 of Idaho's Constitution. S.J. Res. No. 105, 1993 Idaho Sess. Laws 1530–31. The amendments, which were ratified in 1994, provided that a bipartisan citizens' commission, rather than the Legislature, would be responsible for the legislative redistricting process. Subsequent legislation in 1996 created the eight statutes governing the commission that are still largely in effect today. Act of Mar. 12, 1996, ch. 175, § 1, 1996 Idaho Sess. Laws 561–64; *see also* I.C. §§ 72-1501–08. The Statement of Purpose accompanying the 1996 legislation indicates that "[t]he purpose of this legislation [wa]s to implement the provisions of Section 2, Article III, of the State Constitution." No mention was made of implementing any of the provisions in article III, section 5. Article III, section 5 has not been amended since 1986, so the "reasonably determined by statute" phrasing remains.

In light of this history, the phrase "reasonably determined by statute" should be read as "reasonably determined." The "by statute" language became inoperative in light of the 1994 constitutional amendment because, unlike the Legislature, the Commission does not need to pass a statute to implement the redistricting plan it adopts. Further, given the 1994 constitutional amendment, the language "reasonably determined" now refers to the Commission's determinations concerning how many counties must be divided to comply with the Federal Constitution. Article III, section 5 thus directs us that, when reviewing Petitioners' claims, we must determine whether the Commission "reasonably determined" the number of counties that must be divided to comply with the Equal Protection Clause. This interpretation is consistent with

10

our prior holdings. *See, e.g.*, *Bonneville Cnty.,* 142 Idaho at 472 n.8, 129 P.3d at 1221 n.8 ("We believe the same discretion and judgment that was vested in the Legislature when it was drawing districts applies to the Commission, unless otherwise limited by statute or the constitution.").

In its Final Report, the Commission explicitly found that Plan L03 had a maximum population deviation of 5.84% and divided eight counties: Ada, Bannock, Bonner, Bonneville, Canyon, Kootenai, Nez Perce, and Twin Falls. The Commission noted that there were five plans— L071, L075, L076, L077, and L079—proposed by members of the public that divided only seven counties; however, in considering these other plans, the Commission determined that "each would likely violate the Equal Protection Clause and that they [were] also inconsistent with other principles applicable to the redistricting process."

Petitioners Durst, Ada County, Allan, Boyer, and Canyon County all assert that Plan L03 is unconstitutional under Article III, section 5 of the Idaho Constitution because Plan L03 splits more counties than necessary to comply with the Federal Constitution's Equal Protection Clause. Except for Durst, these Petitioners identify three of the publicly submitted plans, rejected by the Commission, which split only seven counties: Plans L075, L076, and L079. Because the total population deviation in each of these plans is at or just below 10%, rendering the plans presumptively constitutional under the Equal Protection Clause, Petitioners contend the existence of these plans demonstrate that the number of county divisions necessary to comply with the Equal Protection Clause is seven. Therefore, Petitioners argue that Plan L03 is unconstitutional under Article III, section 5 of the Idaho Constitution because it splits eight counties, one more than is necessary to comply with the Federal Constitution.

In addition, Durst contends that the Commission neglected to adequately consider his proposed plan, Plan L084, asserting that "[t]he Commission treated Plan L084 as if it had the same number of counties divided as Plan L03 because the Commission did not differentiate between internal and external divisions[.]" Durst argues internal divisions should be favored over external divisions and contends Plan L084 should have been considered along with the other five plans that only divided seven counties, because each divided county in those plans has an external division.

This Court has previously held, when assessing whether a redistricting plan violates the Idaho Constitution because it divides too many counties, that "[a] county can be divided *solely* for one reason—'to the extent it is reasonably determined by [the Commission] that counties must be divided to . . . comply with the constitution of the United States.'" *Twin Falls Cnty.*, 152 Idaho at

11

349, 271 P.3d at 1205 (quoting IDAHO CONST. art. III, § 5) (italics and ellipsis in original). "The extent to which counties (plural) must be divided to comply with the Federal Constitution can be determined only by counting the total number of counties divided under the plan." *Id.* "If one plan that complies with the Federal Constitution divides eight counties and another that also complies divides nine counties, then the extent that counties must be divided in order to comply with the Federal Constitution is only eight counties." *Id.*

In *Twin Falls County*, this Court reviewed a challenge to a legislative redistricting plan adopted by the 2011 Commission. *Id.* at 347, 271 P.3d at 1203. In reviewing the plan adopted by the 2011 Commission, this Court concluded that the plan complied with the Equal Protection Clause because it had a maximum deviation less than 10%. *Id.* at 350, 271 P.3d at 1206. Without any further discussion or analysis, this Court then stated the plan did not comply with the Idaho Constitution because it divided 12 counties while "other plans that comply with the Federal Constitution . . . divide fewer counties." *Id.* In so holding, this Court failed to consider the language in Article III, section 5 that indicates a county may be divided if the commission "reasonably determined" that twelve counties had to be divided to comply with the Equal Protection Clause. Further, the holding in *Twin Falls County* appears to imply that so long as a plan has a maximum deviation of less than 10%, the plan automatically satisfies the Equal Protection Clause.

We now take this opportunity to disavow our decision in *Twin Falls County* to the extent it failed to give effect to the "reasonably determined" language contained in Article III, section 5. We also disavow the decision to the extent it suggested that a plan with a maximum deviation of less than 10% automatically satisfies the Equal Protection Clause because such a suggestion is not supported by the law. "[S]tate legislative plans with population deviations of less than 10% may be challenged based on alleged violation of the one person, one vote principle." *Larios v. Cox*, 300 F.Supp.2d 1320, 1340 (N.D.Ga. 2004) (three-judge panel), *aff'd by Cox v. Larios*, 542 U.S. 947 (2004). "Indeed, the very fact that the Supreme Court has described the ten percent rule in terms of 'prima facie constitutional validity' unmistakably indicates that 10% is not a safe harbor." *Id.* at 1340–41 (quoting *Connor v. Finch*, 431 U.S. 407, 418 (1977)).

Regardless of whether we consider both the number of counties divided *and* the number of external divisions per county—a point of law we need not decide today—Petitioners' constitutional challenge to Plan L03 still fails because Petitioners have not established that the

Commission erred in rejecting Plans L075, L076, and L079. Petitioners have failed to show the Commission unreasonably determined these plans did not comply with equal protection.

Plans L075 and L076 both have maximum population deviations of 9.97%. Plan L079 has a maximum population deviation of exactly 10%. Plan L084 has a maximum population deviation of 9.48%. Petitioners maintain that, because these plans have a maximum population deviation of 10% or less, each plan is presumptively constitutional. However, *presumptively* constitutional does not mean constitutional. "[D]eviations from exact population equality may be allowed in some instances in order to further legitimate state interests such as making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts, and avoiding incumbent pairings." *Larios*, 300 F.Supp.2d at 1337. "However, where population deviations are not supported by such legitimate interests but, rather, are tainted by arbitrariness or discrimination, they cannot withstand constitutional scrutiny." *Id.* at 1338.

Members of the public submitted plans to the Commission for consideration. *See* I.C. § 72-1505. Generally, the proposed plans were submitted through a website; the plans' proponents were then able, but not required, to give testimony in front of the Commission regarding how and why the plans were drawn as they were. Importantly, this means that, absent a scenario where a map drafter articulates an arbitrary or discriminatory intent behind the plan, the Commission must evaluate each submitted plan for arbitrariness or discrimination based solely on the plan itself.

Using this limited information, the Commission specifically analyzed Plans L075, L076, and L079 regarding whether they conformed to the Equal Protection Clause of the Federal Constitution and found each lacking in that regard. The Commission's Final Report includes an extensive and illuminating analysis of these three plans. The challengers are obliged to demonstrate that the Commission erred when it "reasonably determined" that splitting eight counties was necessary to comply with the Federal Constitution. As a result, we find it appropriate to quote the Commission's report at length to illustrate the in-depth evidentiary analysis undertaken by the Commission.

> While numeric equality between districts is not the only redistricting criterion the Commission is obliged to consider, it is the first and most important one. In creating legislative districts, the Commission must "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." This principle, known as the "one person, one vote" principle, allows small deviations from a strict population standard only if

13

the deviations are based on "legitimate considerations incident to the effectuation of a rational state policy."

Idaho's total state population, as determined by the 2020 census, is 1,839,106. The ideal district size — the quotient of the total state population divided by the total number of districts, 35 — is 52,546. That number — 52,546 — must serve as the Commission's polestar, and each deviation in each district from that number must result from service to a rational state policy, legitimately applied.

As discussed above, plans with a maximum population deviation less than 10% are generally constitutional but are unconstitutional if the deviation results from an irrational purpose or if the individual right to vote in some parts of the state is diluted as compared to others. Even a deviation meant to serve a rational state policy is impermissible if the application of the policy is inconsistent, arbitrary, or discriminatory. Nonpopulation criteria may justify deviation from the ideal district size only if they are applied consistently and neutrally.

The Commission determined that a good faith effort to achieve voter equality — the standard mandated by the United States Supreme Court in *Reynolds* — requires staying as close as possible to the ideal district size while still effectuating state policy. The Commissioners agreed that in no instance would they craft a district that deviated more than 5% over or under the ideal district size, unless the district was an outlier and there was an extraordinarily compelling reason for the larger deviation.

The Commission's rationale here was threefold. First, any district deviation that was over or under 5% from the ideal district size would put pressure, perhaps significant, on other districts to have a minimal deviation. Otherwise, the plan might violate the 10% guideline for constitutionality. If, for example, one district was very underpopulated, with a deviation of -7.5%, then every other district in the state would require a deviation less than +2.5%. The Commission did not believe, absent an extraordinary reason, that the people in one district deserved such preferential treatment at the expense of the people in the rest of the state.

Second, the Commission believed that a lopsided deviation might well represent an arbitrary and inconsistent application of state policy, especially if an exception were made for multiple districts, instead of one outlier district with unique geographical challenges.

Finally, the Commission suspected that a lopsided deviation, which would represent significant overpopulation or underpopulation of a district — a difference of thousands of people — could result in dilution of the individual right to vote and the diminishment of effective representation. Constituents in a heavily overpopulated district, for example, could not be said to enjoy approximately the same access to their legislators as constituents in more underpopulated districts.

The Commission's approach ultimately yielded **Plan L03**, which has a 5.84% maximum population deviation and divides eight counties. The Commission's detailed rationale for dividing eight counties is explained in the General Legislative Plan Findings below. However, five proposed plans submitted

14

by the public divided only seven counties. After closely analyzing the plans, the Commission finds that each would likely violate the Equal Protection Clause and that they are also inconsistent with other principles applicable to the redistricting process.

. . .

Two of the plans, **L071** and **L077**, both have maximum population deviations of 12.72%, which means they are *prima facie* unconstitutional. Two more, **L075** and **L076**, have a maximum population deviation of 9.97%, and the last one, **L079**, has a maximum population deviation of 10%. These last three plans have significant defects and stand on dubious equal protection grounds.

**L075** and **L076** are presumptively constitutional, if barely. But that is not the end of the analysis. As mentioned above, the 10% guideline is not a safe harbor; a plan with a presumptively constitutional deviation may still be found unconstitutional if the deviation results from an unconstitutional, irrational, inconsistent, or discriminatory state purpose.

The plain purpose of **L075** is to achieve a seven-county-split plan. This is not a plan one would draw if equal protection were the primary purpose being served. The five northernmost districts in the state are all underpopulated to an extreme degree, with deviations of either -7.25% (Districts 1, 2, 3, and 4) or -7.24% (District 5). District 6 is also significantly underpopulated, with a -6.6% deviation. Outside of North Idaho, Districts 10 through 26, along with 28, 31, and 33, are all overpopulated, with ten districts — 11, 12, 14, 17, 18, 19, 20, 22, 23, and 33 — at the top end of the deviation range, +2.72%. Three more districts, 10, 15, and 16, have a deviation of +2.71%; one district, 24, has a deviation of +2.7%; two districts, 13 and 21, have a deviation of +2.69%; and one district, 26, has a deviation of +2.68%. There is a difference of over 5,200 people between the least and most populated districts in **L075**. In legislative districts, that is a significant disparity.

If the Commission adopted **L075** as its redistricting plan, the Commission could not sincerely claim that it attempted, in good faith, to achieve voter equality. This becomes obvious when the district boundary lines in some of the overpopulated district are examined. Consider the boundary line between Districts 11 and 12 in Figure 4[.] The yellow line is the district boundary, while the straight horizontal line running above it is Ustick Road — a major thoroughfare and therefore an attractive prospect for a district boundary. One common theme that emerged in the public testimony and comments submitted to the Commission is that roads, especially major roads, make for good district boundaries. But the district boundary in Figure 4 does not follow the obvious straight line. Rather, the boundary meanders about on no set course, carving out census blocks here and there, following no logic or reason except this: to ensure that the people in the white, unshaded census blocks stay in District 11, so that District 12's population does not increase. If the boundary were cleaned up even slightly, so that the 38 people in the census blocks marked by the red arrows were moved to District 12 instead of District 11, that would raise the deviation of District 12 to +2.79%, making the

maximum population deviation of **L075** 10.04% and the plan *prima facie* unconstitutional.



**Figure 4**
Boundary Line between Districts 11 and 12
Plan L075

In the opinion of the Commission, a sincere commitment to equal protection — a *good faith* commitment to equal protection — requires more than drawing an irregular line so that 38 people fall on one side of the line instead of the other. If a plan requires irrational boundary manipulation to fall just under the 10% guideline, then the plan is, at the very least, constitutionally suspect.

In making this analysis, the Commission does not mean to imply that anyone who submitted a seven-county-split plan did so for improper purposes. The Commission sincerely appreciates the efforts and participation of all the Idahoans who submitted maps and provided guidance to the Commission.

But if equal protection is to mean anything, it must mean more than drawing irregular lines to capture 38 people for one district instead of another. Commitment to equal protection requires aiming for 0% deviation, not 10%. Commitment to equal protection requires being able to justify deviations with a rational state policy, consistently and neutrally applied.

It is undoubtedly a rational state policy to preserve county integrity as much as possible. But that interest must be served consistently and in a way that complies with both the federal and state constitutions, and the Commission finds that **L075**

16

does neither. In addition to the equal protection problems discussed above, the plan fails to preserve county integrity. Though it does indeed divide only seven counties, it does this by dividing Bonner County — population 47,110 — into three separate legislative districts. In District 1, part of Bonner is combined with Boundary County; in District 2, part of Bonner is combined with Shoshone County, and part of Kootenai County; and in District 3, part of Bonner is combined with Kootenai.

The reason this is problematic is that Article III, Section 5 of the Idaho Constitution provides that a county may be divided for only one reason: to comply with the United States Constitution. As the Idaho Supreme Court stated in *Twin Falls County v. Idaho Commission on Redistricting,* the word "only" means "solely." "A county can be divided *solely* for one reason" — to comply with equal protection. Thus, a county cannot be divided, once or more than once, just to spare another county from being divided. The protection of counties is a provision of the Idaho Constitution, not the United States Constitution.

If a redistricting plan divides a county, such as Bonner, for a reason other than equal protection, then the plan is invalid under the Idaho Constitution. And there is no equal protection standard that justifies dividing Bonner County more than once. Mathematically, Bonner County is smaller than the ideal district size and should not be divided at all. As explained in General Legislative Plan Finding 4.A., the Commission found it necessary, due to the population distribution in North Idaho, to split Bonner once, but finds no equal protection justification for splitting Bonner twice. Indeed, the division of Bonner into three districts might not even be necessary to produce a map that divides only seven counties. **Plan L079,** another seven-county-split plan, divides Bonner in to two districts, not three.

Based on the analysis above — because **Plan L075** significantly underpopulates one region of the state at the expense of other regions, thus making the weight of a citizen's vote dependent on where in the state the citizen lives, and because Bonner County is divided for reasons unrelated to equal protection — the Commission finds that **Plan L075** is constitutionally unviable and should not be adopted as Idaho's legislative redistricting plan.

**Plan L076** shares many of the same problems that **L075** has. Six of the North Idaho districts are, again, significantly underpopulated. Bonner County is, again, unnecessarily divided into three districts. The systematic underpopulation of North Idaho puts so much pressure on the rest of the plan that 26 districts — almost 75% of them — are overpopulated. Seven of them — 11, 12, 14, 17, 18, 19, 20, and 33 — are at the top end of the maximum population deviation. Many district boundaries are similar to those in **L075,** and similarly arbitrary; again, these boundaries seem to have been manipulated specifically to keep the maximum population deviation just under 10%. The Commission therefore finds that **Plan L076** is constitutionally unviable, for the same reason that L075 [sic] was.

**Plan L079** is in some ways a more attractive plan than either **L075** or **L076.** The district boundary lines seem cleaner and less arbitrary. Bonner County is divided into two districts, not three, but **L079** has a maximum deviation of exactly 10%.

Courts have been somewhat imprecise in describing how a maximum population deviation of exactly 10% should be viewed. The United States Supreme Court observed in *Brown v. Thomson,* 462 U.S. 835, 843 (1983), that plans with a maximum population deviation under 10% generally fall within the category of permissible minor deviations, while "a plan with larger disparities in population... creates a *prima facie* case of discrimination and therefore must be justified by the state." This would imply that a deviation of exactly 10% is *prima facie* unconstitutional. However, at other times, the United States Supreme Court has described plans with a maximum population deviation *above* 10% as being *prima facie* unconstitutional.

Assuming *arguendo* that no presumption applies to a plan with a maximum population deviation of exactly 10%, or that a plan with a maximum population deviation of exactly 10% is presumptively constitutional, the Commission nevertheless finds that **Plan L079** does not satisfy equal protection standards for much the same reason that **L075** and **L076** did not: the significant underpopulation of the North Idaho districts at the expense of much of the rest of the state does not serve the cause of voter equality.

What all five seven-county-split plans demonstrated to the Commission is this: in order for the Commission to adopt such a plan, it would have to significantly underpopulate several North Idaho districts, and furthermore, it would have to draw irregular district boundary lines to achieve a presumptively acceptable maximum population deviation. Drawing more regular boundary lines to avoid voter confusion would likely put the state in the position of having to justify a plan with a maximum population deviation of more than 10%. In light of existing precedent from both the United States Supreme Court and the Idaho Supreme Court, the Commission did not believe it could justify a seven-county-split plan.

To the Commission's knowledge, the Idaho Supreme Court has never upheld a legislative redistricting plan with a maximum population deviation of 10% or more. In three cases — *Bingham County v. Idaho Commission for Reapportionment*, *Smith v. Idaho Commission on Redistricting*, and *Hellar v. Cenarrusa*, 106 Idaho 586, 682 P.2d 539 (1984) — the Idaho Supreme Court invalidated plans with deviations of, respectively, 11.79%, 10.69%, and 32.94%.

However rational Idaho's policy of maintaining county integrity might be, the Idaho Constitution itself makes clear that the policy is subordinate to the requirements of equal protection, and the Commission is skeptical of its ability to justify any plan that appears to systematically underpopulate, to a significant degree, six districts in one region of the state. In coming to this conclusion, we have found the case *Larios v. Cox* instructive. In that case, a federal court found Georgia's legislative redistricting plan unconstitutional. The plan had a maximum population deviation of 9.98% but "intentionally and systematically" underpopulated districts in certain parts of the state while overpopulating districts in other parts of the state. The federal court took a dim view of how the plan drafters, rather than making an effort to equalize districts throughout the state, only shifted "as much population…as they thought necessary to stay within a total population deviation of 10%." The decision was affirmed without comment by the

United States Supreme Court, but in a concurring opinion, Justice Stevens remarked that "regionalism is an impermissible basis for population deviations."

Whether the underlying purpose of a seven-county-split map is a sincere effort to effectuate Idaho's policy against county division or a discriminatory effort to give people in one region more voting power than people in the rest of the state, the effect is the same: North Idaho voters are favored and voters in the other parts of the state are disfavored. Either way, the Commission does not believe these maps reflect the application of equal protection as the primary principle in redistricting.

Based on the analysis above, and for the reasons explicated in the General Legislative Plan Findings below, the Commission finds that the minimum number of counties that must be divided to comply with equal protection standards is eight.

(Italics and bolded emphases in original; footnotes, some figures, and some citations omitted.) The Commission analyzed its responsibility to achieve the "one person, one vote" principle at length. Further, it cogently explained why Plans L075, L076, and L079 were deficient in that regard. The Commission rejected Plans L075, L076, and L079 for specific reasons related to equal protection: the plans each underpopulate northern Idaho at the expense of the rest of the state and only achieve a presumptively constitutional maximum population deviation using arbitrary boundary lines.

The Commission did not directly discuss Plan L084 in its Final Report; however, as noted by Respondents in their briefing before this Court, Plan L084 overpopulates districts in Ada County by dividing it into nine districts, each with a population exceeding the ideal district size by between 4.12% and 4.94%. Respondents correctly point out that there are no other districts in Plan L084 that are as overpopulated as those in Ada County. Because overpopulated districts dilute voting power for citizens in those districts, Plan L084 would result in citizens in Idaho's most populous county—constituting more than one-quarter of the state's population—being the most underrepresented. Consequently, Plan L084 suffers from the same problem as Plans L075, L076, and L079: it overpopulates one region of the state while underpopulating northern Idaho.

Petitioners argue that there is no evidence to show that any of their championed plans were drawn to intentionally favor one region of the state over another. They point to this Court's decision in *Bonneville County*, which stated that "a regional deviation, by itself, is not enough to overcome the presumption of constitutionality." 142 Idaho at 470, 129 P.3d at 1219. However, we can find no fault with the Commission's determination that the Equal Protection Clause mandates it *cannot* favor one region of the state over another. "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimination[] based upon factors such as race or economic status." *Reynolds*, 377 U.S.

at 566 (internal citations omitted). "The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote." *Id.* at 567. "Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests." *Id.* at 562. "A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm." *Id.* at 567. "[T]he weight of a citizen's vote cannot be made to depend on where he lives." *Id.* "The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well of all races." *Id.* at 568. In keeping with this restraint on regional favoritism, we have held "while the purpose of one person, one vote is to protect voters, not regions, a plan will be held unconstitutional where the individual right to vote in one part of a state 'is in substantial fashion diluted when compared with votes of citizens living in other parts of the State.'" *Bonneville Cnty,* 142 Idaho at 468, 129 P.3d at 1217 (citations omitted).

Petitioners ask us to second-guess the Commission and decide that another plan is better. The Constitution, however, directs us to review whether the Commission reasonably determined eight counties must be split to satisfy equal protection. A necessary part of that inquiry is to review whether the Commission reasonably determined that the other plans did not satisfy equal protection. We hold that the Commission's determination that plans put forth by Petitioners did not satisfy equal protection was reasonable. Outside establishing their plans are at or below a 10% maximum population deviation, Petitioners have not established any of their plans truly comply with the one person, one vote principle. The Constitution does not allow us to pick another plan just because the numbers are different.

Due to Idaho's unique geography and the supremacy of federal law, there is unavoidable tension between the Idaho Constitution's restraint against splitting counties and the Federal Constitution's Equal Protection Clause. Navigating this tension is no easy feat. Effectuating a plan that adheres to both federal and state constitutional mandates is a delicate balancing act, entrusted to the Commission by the Idaho Constitution and the citizens of Idaho. IDAHO CONST. art. III, § 2. To perform that balancing act as quickly and thoroughly as the Commission did, resulting in a legislative plan with unanimous bipartisan support on behalf of all six commissioners, is certainly laudable. We think it appropriate to acknowledge the challenges the Commission faced and to not overstep our responsibility in acknowledging that it is the Commission that must make difficult choices in trying to balance the various competing interests involved. *See Bonneville Cnty.*, 142

20

Idaho at 472, 129 P.3d at 1221 ("We simply cannot micromanage all the difficult steps the Commission must take in performing the high-wire act that is legislative redistricting."). Our review is constitutionally limited: pursuant to Article III, section 5, we must determine whether the Commission "reasonably determined" the number of counties that must be divided to comply with the Equal Protection Clause. IDAHO CONST. art. III, § 5. We conclude the Commission did so here.

We hold that Petitioners have failed to meet their burden of showing that the Commission unreasonably determined that eight county splits were necessary to afford Idaho's citizens equal protection of the law. Therefore, Petitioners have failed to demonstrate that Plan L03 violates either the state or federal constitutions.

**C. Plan L03 does not violate Idaho Code section 72-1506.**

Petitioners Ada County, Allan, Boyer, and Stucki contend that Plan L03 violates Idaho Code section 72-1506. Idaho Code section 72-1506 provides in full:

Congressional and legislative redistricting plans considered by the commission, and plans adopted by the commission, shall be governed by the following criteria:

(1) The total state population as reported by the U.S. census bureau, and the population of subunits determined therefrom, shall be exclusive permissible data.

(2) To the maximum extent possible, districts shall preserve traditional neighborhoods and local communities of interest.

(3) Districts shall be substantially equal in population and should seek to comply with all applicable federal standards and statutes.

(4) To the maximum extent possible, the plan should avoid drawing districts that are oddly shaped.

(5) Division of counties shall be avoided whenever possible. In the event that a county must be divided, the number of such divisions, per county, should be kept to a minimum.

(6) To the extent that counties must be divided to create districts, such districts shall be composed of contiguous counties.

(7) District boundaries shall retain the local voting precinct boundary lines to the extent those lines comply with the provisions of section 34-306, Idaho Code. When the commission determines, by an affirmative vote of at least five (5) members recorded in its minutes, that it cannot complete its duties for a legislative district by fully complying with the provisions of this subsection, this subsection shall not apply to the commission or legislative redistricting plan it shall adopt.

(8) Counties shall not be divided to protect a particular political party or a particular incumbent.

21

(9) When a legislative district contains more than one (1) county or a portion of a county, the counties or portion of a county in the district shall be directly connected by roads and highways which are designated as part of the interstate highway system, the United States highway system or the state highway system. When the commission determines, by an affirmative vote of at least five (5) members recorded in its minutes, that it cannot complete its duties for a legislative district by fully complying with the provisions of this subsection, this subsection shall not apply to the commission or legislative redistricting plan it shall adopt.

I.C. § 72-1506. It is well established that "the requirements of Idaho Code section 72–1506 'are subordinate to the Constitutional standard of voter equality and the restrictions in the Idaho Constitution upon splitting counties except to achieve that voter equality.'" *Twin Falls Cnty.*, 152 Idaho at 349, 271 P.3d at 1205. As this Court explained in *Twin Falls County*,

[t]here is a hierarchy of applicable law governing the development of a plan for apportioning the legislature: The United States Constitution is the paramount authority; the requirements of the Idaho Constitution rank second; and, *if the requirements of both the State and Federal Constitutions are satisfied,* statutory provisions are to be considered.

*Id.* at 348, 271 P.3d at 1204 (italics added).

Ada County argues that Plan L03 violates Idaho Code section 72-1506 because it unnecessarily divides Ada and Canyon Counties and fails to keep communities of interest intact by placing rural and urban populations within the same district. The requirements of Idaho Code section 72-1506 are subservient to the requirements of both the federal and state constitutions, and Ada County has not established that the Commission unreasonably determined that the plans Ada County puts forth—L075, L076, and L079—violate equal protection.

Stucki faults Plan L03 for having "oddly shaped districts," not retaining local precinct boundary lines, unnecessarily splitting communities of interest, and having districts that are not directly connected by roadways, all in violation of Idaho Code section 72-1506. Stucki contends the Commission should have split nine counties in order to better comply with the requirements of the statute. The Commission, however, could not do so and at the same time comply with the Idaho Constitution: "a county may be divided in creating districts *only* to the extent it is reasonably determined by statute that counties must be divided to . . . comply with the constitution of the United States." IDAHO CONST. art. III, § 5. Because of this constitutional restraint, the Commission concluded it was unable to split counties to comply with the statute. Had the Commission followed the reasoning that Stucki now lays out, the plan it adopted would be unconstitutional under Article III, section 5.

22

Allan and Boyer assert that Plan L03 violates Idaho Code section 72-1506(2) because the Plan does not adequately preserve the Shoshone-Bannock and Coeur d'Alene tribes as communities of interest. Specifically, they argue that Plan L03 splits the Shoshone-Bannock tribe into three separate districts and splits the Coeur d'Alene tribe into two districts. Allan and Boyer point to Plan L078, a plan that splits the same eight counties as Plan L03. Plan L078 also splits the Shoshone-Bannock tribe, but places "the bulk" of its population into a single district, rather than "split[ting] the Reservation's primary hub and population in half," as Plan L03 does. Additionally, Plan L078 leaves the Coeur-d'Alene tribe intact and in a single district.

From the outset, even though the Commission did not specifically analyze Plan L078 in its Final Report, we note that Allan and Boyer's championed plan suffers from a similar issue as the plans discussed above. Plan L078 has a maximum population deviation of 9.83%, rendering it presumptively constitutional. However, like the plans discussed above, Plan L078 suffers from regional favoritism: Plan L078 underpopulates southeastern Idaho at the expense of voters in Ada, Canyon, and Gem Counties. Fifteen of the 35 districts are underpopulated; of those, nine are in southeastern Idaho and, on average, are underpopulated by -4.43%. In contrast, Ada, Canyon, and Gem Counties are comprised of 14 districts, *all* of which are overpopulated, on average, by 2.92%. Given the level of regional favoritism displayed in Plan L078, we cannot fault the Commission for choosing a different plan in order to comply with the Equal Protection Clause.

Additionally, like the tension between the Idaho Constitution's restraint against splitting counties and the Federal Constitution's Equal Protection Clause, the tension between the subsections in Idaho Code section 72-1506 requires that the Commission perform a delicate balancing act. For example, Plan L078 preserves the Tribes as communities of interest pursuant to Idaho Code section 72-1506(2) but does not contain districts which are "substantially equal in population," as is required by Idaho Code section 72-1506(3). Compared to Plan L078, Plan L03 does a worse job at preserving the Tribes but a better job at achieving districts which are "substantially equal in population," given that Plan L03 has a maximum deviation of only 5.84%. When competing interests are at stake, it is the Commission's responsibility—entrusted to it by the people of Idaho—to determine how best to balance those interests, and we will not substitute our own views for the Commission's. *See Bonneville Cnty.*, 142 Idaho at 472, 129 P.3d at 1221.

Though Allan and Boyer contend "[i]t is self-evident that the Tribes' interests in unity and maintaining their voting power should receive the same respect, if not more, than Idaho's counties

or cities do during the redistricting process," that is not how the law is written. We are unable to raise community interests, such as the Tribes', above the counties' interests, which are protected to a greater degree by the Idaho Constitution. To afford the Tribes the heightened status they seek, an amendment to the state constitution would be required. Likewise, Idaho Code section 72-1506(2) only requires that, "[t]o the maximum extent possible, districts shall preserve traditional neighborhoods and local communities of interest." I.C. § 72-1506(2). The statute does not elevate a particular type of community of interest above another: cities, neighborhoods, and tribal reservations are all treated the same under the statute.

Based on the foregoing analysis, we hold that Plan L03 does not violate Idaho Code section 72-1506.

## IV.    CONCLUSION

For the reasons stated above, we deny Petitioners' requests to issue a writ of prohibition barring implementation of the Commission's final plan, L03. We award costs to Respondents as allowed by Idaho Appellate Rule 40.

Chief Justice BEVAN, Justices BRODY, MOELLER and ZAHN CONCUR.

## ON DENIAL OF PETITION FOR REHEARING

STEGNER, Justice.

The Petitioner, Ada County, has filed a petition and brief seeking rehearing of this Court's opinion in this case which was released January 27, 2022. Having now had the opportunity to review Ada County's petition and brief in support of its petition, we deny the Petition for Rehearing of our decision in *Durst v. Idaho Commission for Reapportionment*.

Ada County raises four arguments in support of its Petition for Rehearing. However, before we address the specific arguments raised by Ada County, we initially address two premises that appear to underlie its Petition. First, the arguments assume that Petitioners' claims required this Court to decide whether Plans L075, L076, L079, and L084 violated the Equal Protection Clause of the United States Constitution. However, the Petitioners did not raise an equal protection challenge. Instead, they claimed that Plan L03 violated Article III, Section 5 of the Idaho Constitution and Idaho Code section 72-1506.

24

The relevant language from Article III, Section 5 does not require this Court to determine whether the other plans referenced by Petitioners violate the Equal Protection Clause of the United States Constitution:

> A senatorial or representative district, when more than one county shall constitute the same, shall be composed of contiguous counties, *and a county may be divided in creating districts only to the extent it is reasonably determined by statute that counties must be divided to create senatorial and representative districts which comply with the constitution of the United States*.

IDAHO CONST. art. III, § 5 (italics added). As we explained in *Durst*, this constitutional language allows a county to be divided when it is *reasonably determined* by the Commission that a county must be divided to comply with the United States Constitution. The wording of Idaho's Constitution thus requires this Court to determine whether the Commission *reasonably determined* the number of counties that must be split to comply with equal protection. Ada County seems to contend that our review should begin and end with an equal protection analysis of any other plans that split fewer counties. However, had the drafters of this provision and Idaho's citizens intended this Court to make its own determination of how many counties needed to be divided to comply with equal protection, there would be no need for the "reasonably determined" language. Rather, the provision would direct this Court to determine whether the number of counties divided was necessary to comply with equal protection. As a result, Idaho's Constitution does not require this Court to determine whether any other plans splitting fewer counties violated the Equal Protection Clause but instead directs us to review whether the Commission reasonably determined eight counties needed to be split to comply with equal protection.

The second premise that appears to underlie Ada County's arguments is that this Court's decision in *Durst* constituted a "dramatic change to reapportionment law in Idaho." We construe Ada County's argument as taking issue with our statements disavowing portions of this Court's prior decisions in *Twin Falls County* and *Bonneville County*. "In Idaho, 'the rule of stare decisis dictates that we follow [controlling precedent] unless it is manifestly wrong, unless it has proven over time to be unjust or unwise, or unless overruling it is necessary to vindicate plain, obvious principles of law and remedy continued injustice.'" *Farm Bureau Mutual Ins. Co. of Idaho v. Cook*, 163 Idaho 455, 459–60, 414 P.3d 1194, 1198–99 (2018) (quoting *Houghland Farms, Inc. v. Johnson*, 119 Idaho 72, 77, 803 P.2d 978, 983 (1990)). In *Durst*, we explained we abrogated portions of our prior decisions only to the extent they were manifestly wrong. *Bonneville County* incorrectly stated that Idaho Code section "72-1506 qualifies as the statute referenced in Idaho

25

Const. art. III, § 5." 142 Idaho 464, 473, 129 P.3d 1213, 1222 (2005). We are not alone in this line of thought: the author of the majority decision in *Bonneville County* has since recognized that decision was premised on an erroneous interpretation of the "reasonably determined by statute" phrase in article III, section 5 of the Idaho Constitution. *Twin Falls Cnty. v. Idaho Comm'n on Redistricting*, 152 Idaho 346, 356, 271 P.3d 1202, 1212 (J. Jones, J., dissenting) ("The opinion in *Bonneville County* should have stated that the Commission drew its authority from Article III, § 2, and that the Commission, through its duly adopted plan, is the mechanism intended by the Legislature to make the reasonable determination contemplated in Article III, § 5.").

In *Durst*, we maintained and followed the holding of *Bonneville County*, "that by amending art. III, § 2, the people intended to remove the Legislature from the details of the [redistricting] process." 142 Idaho at 473, 129 P.3d at 1222. *Bonneville County* is thus consistent with our holding in *Durst* that the Commission is the entity with the discretion to determine—subject to this Court's oversight—whether and how to split counties. *See id. Twin Falls County*, on the other hand, contravened the principles set forth in *Bonneville County* and our prior case law. 152 Idaho at 350–51, 271 P.3d at 1206–07. The analysis in *Twin Falls County* as to whether a county split was necessary to comply with the Equal Protection Clause was erroneously focused only on whether a plan's maximum population deviation was below 10%. *Id.* That analysis misapplied equal protection precedent and failed to give proper acknowledgement to the Commission's decision making that county splits were necessary to comply with equal protection, as is required under article III, section 5 of the Idaho Constitution and our prior case law. *Id.* Thus, it was this Court's decision in *Twin Falls County*, not *Durst*, which was the "dramatic change to reapportionment law in Idaho." Our decision in *Durst* was simply a return to this Court's correctly decided precedent.

Turning to the specific arguments Ada County raises in its Petition for Rehearing, Ada County first argues that we unconstitutionally delegated our responsibility for interpreting the Equal Protection Clause to the Commission because we did not independently review Plans L075, L076, L079, and L084 to determine whether the plans complied with equal protection. However, Petitioners never alleged that Plan L03 violated the Equal Protection Clause. As a result, we did not hold that any other plans were unconstitutional. We simply addressed the Petitioners arguments and held that, under the Idaho Constitution, the Commission reasonably determined eight county splits were necessary to comply with equal protection.

26

Second, Ada County contends that we have imposed "stricter requirements in determining compliance with the Equal Protection Clause" "than is required under federal law" because we "include[d] an intermediate step where an unelected, unaccountable state body makes a reasonable determination that its decisions have complied with federal law." As explained above, we did not render any holdings concerning whether the other plans complied with the Equal Protection Clause and therefore did not impose any additional requirements to an equal protection analysis. Ada County seeks to recast our decision in terms of federal constitutional law when our decision was clearly decided on state constitutional grounds.

Third, Ada County asserts that this Court judicially amended Article III, Section 5 of the Idaho Constitution through our interpretation of the phrase "reasonably determined by statute." While Ada County discusses Idaho Code section 72-1506 concerning county splits, it fails to explain how that statute can be read to somehow supersede the Equal Protection Clause. The legislative history of the statute not only fails to mention Article III, Section 5 of the Idaho Constitution, but the statute itself provides no guidance on how to draw districts that comply with the "one person, one vote" principle of the United States Constitution. Rather, the statute simply requires that "[d]istricts shall be substantially equal in population and should seek to comply with all applicable federal standards and statutes." I.C. § 72-1506(3). Additionally, while Ada County stresses that the Legislature must have known the meaning of the word "statute" when it put forth Article III, Section 5 for the citizens of Idaho to ratify in 1986, Ada County ignores the subsequent ratification of the 1994 constitutional amendment of Article III, Section 2, which established that a commission for reapportionment would be responsible for redistricting. Ada County's interpretation fails to give effect to the 1994 amendment of our constitution by which the responsibility for redistricting was transferred from the Legislature to the Commission.

Finally, Ada County argues that it "met its burden demonstrating that Plan L03" violated the Equal Protection Clause. However, on page four of its opening brief, Ada County expressly conceded that Plan L03 "meet[s] the equal protection standard." It is therefore not possible for Ada County to have "met its burden demonstrating that Plan L03 was unconstitutional under the Equal Protection Clause" given it took the opposite position when it explicitly denied that it was challenging Plan L03 on federal equal protection grounds.

For the foregoing reasons, Ada County's Petition for Rehearing is DENIED.

Chief Justice BEVAN, Justices BRODY, MOELLER and ZAHN CONCUR.

27